1   Charles F. Robinson (SBN 113197)
    charles.robinson@ucop.edu
2   Margaret L. Wu (SBN 184167)
    margaret.wu@ucop.edu
3   Allison M. Woodall (SBN 178533)
    allison.woodall@ucop.edu
4   Sonya U. Sanchez (SBN 247541)
    sonya.sanchez@ucop.edu
5   UNIVERSITY OF CALIFORNIA
    OFFICE OF THE GENERAL COUNSEL
6   1111 Franklin Street, 8th Floor
    Oakland, CA 94607-5200
7   Telephone:  510.987.9800

8   Jennifer S. Romano (SBN 195953)
    jromano@crowell.com
9   Emily T. Kuwahara (SBN 252411)
    ekuwahara@crowell.com
10  CROWELL & MORING LLP
    515 South Flower Street, 40th Floor
11  Los Angeles, California 90071
    Telephone:  213.622.4750

12
    (Additional counsel listed on signature page)
13
    Attorneys for Plaintiff
14  THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

15              UNITED STATES DISTRICT COURT

16           NORTHERN DISTRICT OF CALIFORNIA

17           SAN FRANCISCO/OAKLAND DIVISION

18  | REGENTS OF THE UNIVERSITY OF CALIFORNIA, | Case No. |
19  | | **COMPLAINT** |
20  | Plaintiff, | |
21  | v. | Administrative Procedure Act Case |
22  | UNITED STATES DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, | Complaint filed: |
23  | | |
24  | | |
25  | | |
26  | | |
27  | Defendants. | |
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

**INTRODUCTION**

1.      The Regents of the University of California bring this action under the Administrative Procedure Act to enjoin and set aside an arbitrary, capricious, and procedurally improper action of defendant United States Immigration and Customs Enforcement ("ICE"), announced on July 6, 2020 ("July 6 Directive"), which stands to cause untold harm to the University of California system and its tens of thousands of international students who rely and depend on this country's foreign-student visa program to gain entry to and remain in the United States to pursue their courses of study. In its stunning Directive, ICE—an agency within defendant United States Department of Homeland Security ("DHS")—announced that unless colleges and universities deliver their coursework through traditional, in-person classroom instruction in the fall, their international students would be required to leave (on pain of removal) if already in the country or would not be permitted to return to the country for their studies if not presently here. The Directive reversed, without explanation, the policy ICE had implemented in March in response to the national health emergency, which permitted foreign students to retain their visa status while their colleges and universities temporarily migrated to remote education out of safety and health concerns. Worse, in doing so, the Directive entirely ignored the accelerating nature of the national emergency or the reliance colleges and universities, as well as their international students, had placed on that March policy.

2.      Under any circumstance, the manner and suddenness by which ICE announced and intends to implement its new policy would be shocking in a system that champions the rule of law and public input on agency rules before they are finalized. That the about-face comes against the backdrop of a worsening public health crisis in this country makes it not only unlawful, but cruel and dangerous.

3.      The background to this lawsuit is by now familiar. On March 4, 2020, Governor Gavin Newsom announced a state of emergency in California.[1] Nine days later, on March 13,

_____

[1] https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

2020, the President of the United States declared a national emergency.[2] The novel coronavirus, the impetus for these declarations and orders, has continued to sweep the globe in the intervening months, causing over 500,000 deaths to date worldwide—over 133,000 deaths just in the United States—and has upended the best laid plans of governments, businesses, and organizations of all kinds, including the nation's institutions of higher education.

4.      Early in the crisis, the federal government recognized the extent to which both public safety and universities' academic endeavors depended on workable remote education. On March 13, 2020, ICE issued an "exemption" to an existing rule requiring students in the United States on certain nonimmigrant student visas (known as "F-1" visas) to attend most classes in person. That March 2020 exemption provided that, in light of both the international pandemic and the needs of students and educational institutions in the United States, students holding F-1 visas could attend classes remotely—that is, by Zoom, Microsoft Meeting, Skype, or similar Internet-based or dial-in means—while retaining their visa status. ICE stated expressly that this exemption would remain "in effect for the duration of the emergency."[3] The emergency continues to this date; by many objective measures, it has gotten worse in many areas of the nation, including in California.

5.      In the months since ICE implemented the March policy, colleges and universities across the United States, including the ten campuses of the University of California system, have adapted their curricula delivery to educate their students remotely. As the pandemic continues to wreak havoc across the country, with increasing and record-breaking numbers of infections in the United States almost every day since Memorial Day 2020, Plaintiff The Regents of the University of California ("The Regents" or "the University") concluded, after much careful consideration, that, to protect the health and lives of its students, faculty, staff, and communities, it should

---

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency- concerning-novel-coronavirus-disease-covid-19-outbreak.

[3] https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

continue to offer most of the fall 2020 term curricula online. Many other colleges and universities throughout the nation have reached the same conclusion.

6.      Remote education is of paramount importance to colleges and universities during the pandemic. COVID-19 is a highly contagious disease that proliferates most when people are in close physical proximity to one another, and particularly when people are indoors. Medical evidence cites indoor gatherings of any size as particular cause for concern. On-campus instruction is typically undertaken in densely populated classrooms where medically recommended social distancing is not feasible and where the virus tends to linger in the air and spread before dissipating, with the potential to spike cases and endanger the health of not only the university community, but anyone with whom the community members may later come into contact. Given the exceptional risk posed by indoor congregation, campuses in the University of California system have limited on-campus residency and in-person, on-campus instruction.

7.      Moreover, in choosing to continue to deliver the majority of their coursework through remote, online delivery, the undergraduate and graduate programs of the University of California system are following the guidance and best practices of the overwhelming majority of public health officials and organizations, including the United States Centers for Disease Control and Prevention ("CDC") and California health officials, while ensuring compliance with various State, county, and municipal governmental orders restricting certain activities during the COVID-19 pandemic.

8.      Against this widely known backdrop, ICE suddenly announced on July 6, 2020, that it was largely rescinding its COVID-19 exemption for international students for classes beginning fall 2020, by requiring all students here under F-1 visas whose university classes are scheduled to be entirely online to leave the United States or transfer to another institution offering in-person classes. *See* ICE's "July 6 Directive," attached as Exhibit 1.[4] ICE is also requiring schools whose classes are scheduled to be entirely online to submit an "operational change plan" no later than Wednesday, July 15, 2020—a mere nine days after the rescission of the exemption

---

[4] https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

was announced. Schools, like the University of California, that will *not* be entirely online must update their operational plans by August 1, 2020. ICE further announced that universities adopting a hybrid model providing a mix of online and in-person classes, such as the University of California, must separately certify for each student on an F-1 visa that the "program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." To comply, universities on a hybrid model must issue a new certificate of eligibility (commonly referred to as a "Form I-20") for each of these students by August 4, 2020, less than a month from now. Universities will have to individually evaluate and certify literally thousands of students in just the next few weeks, even as they continue to grapple with how to safely instruct all their students during the coming term.

9.      Notwithstanding the worsening COVID-19 health crisis, ICE's action was unaccompanied by any written explanation or statement of rationale for the rescission of the exemption. There is no indication that, in reversing course, ICE considered *any* relevant factors, including, but not limited to, the health of students, faculty, university staff, or communities in which those universities are located; the reliance of students and universities on ICE's prior statements that the preexisting exemptions would remain "in effect for the duration of the emergency" posed by the COVID-19 pandemic; or the absence of other options for safely educating their international students. And ICE provided the public no advance notice of its intended action, save for a cryptic FAQ issued a month earlier in which ICE stated without elaboration that it had not issued guidance for the fall 2020 term. Neither did it provide the public any opportunity for submission of comments.

10.      ICE's action leaves hundreds of thousands of international students in limbo, with no viable options for commencing or continuing their educations within the United States. Just weeks from the start of the fall semester, these students are largely unable to transfer to universities providing more substantial on-campus instruction, notwithstanding ICE's suggestion that they may attempt to do so to avoid removal. For students in unique programs or fields of study, transferring to another on-campus program may simply be impossible. Others will find

CROWELL
& MORING LLP
ATTORNEYS AT LAW

themselves faced with the prospect of attempting to transfer mid-program, after having devoted potentially years toward a degree from a particular educational institution, under the tutelage of a particular professor or group of professors. And for many students, returning to their home countries to attend online classes will be impossible or impracticable given time differences, inadequate infrastructure, or other limitations on internet access, including the prohibitive expensive of doing so. In some cases, trying to attend U.S. classes online could even be dangerous.

11.     ICE's action puts universities between a rock and a hard place: either proceed with a significant portion of instruction delivered remotely—which, under ICE's new directive, would mean the near-certain loss of the vast majority of their international students, to the detriment of both those students and the educational program as a whole—or attempt to significantly increase the amount of in-person education, with mere weeks to plan for the overhaul of existing plans and the implementation of new plans before classes resume, and despite the attendant grave risk to public health and safety, all without any rational reason for doing so.

12.     ICE's July 6 Directive will adversely affect both teaching and research efforts, undermining the educational experience provided to students. At UC Berkeley, for example, 29% of all graduate students, and approximately 50% of all engineering graduate students, are international students affected by the July 6 Directive. If these students, absent intervention by this Court, are forced to leave the country, it will significantly undermine UC Berkeley's related research programs; UC Berkeley's ability to teach would also be greatly hindered, as the majority of teaching assistants are graduate student instructors.

13.     ICE's decision appears to be part of a concerted effort by the current administration to force universities to resume in-person classes,[5] notwithstanding the universities' judgment that it is presently neither safe nor advisable to fully resume in-person instruction—a

_____

[5] Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli openly acknowledged on July 7, 2020, that the ICE Directive "will … encourage schools to reopen." *See* https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home.

conclusion bolstered by the federal government's own public health officials (including CDC guidance).

14. ICE's decision displays a callous disregard for students, who would be forced to return to crowded classrooms, and faculty—particularly older faculty to whom COVID-19 poses a greater risk—consigned to the same fate. And to force such a reopening when neither the students nor the universities have sufficient time to react to or address the additional risks to the health and safety of their communities creates chaos and only increases the risk of spreading the COVID-19 virus.

15. For months, universities and students have prepared for the upcoming academic year in reliance on ICE's express March 2020 recognition that the COVID-19 pandemic necessitates exempting international students from a regulatory provision that never anticipated such a health crisis and where its application in the present circumstances would be both exceedingly cruel and equally unwise. ICE's abrupt about-face and rescission of that recognition is a quintessentially arbitrary and capricious act and a profound abuse of discretion. Further, because no advance notice or opportunity for comment was provided, ICE's action is procedurally defective under the Administrative Procedure Act and must be set aside. ICE should be required under the circumstances to abide by the guidance it put forward in March and on which universities and students have relied in good faith in planning for their fall quarters or semesters during an ongoing pandemic.

## THE PARTIES

16. Plaintiff The Regents of the University of California is a corporation authorized and empowered to administer a public trust known as the University of California. Under Article IX, section 9, of the California Constitution, The Regents is vested with full powers of organization and government over the University, including all powers necessary or convenient for the effective administration of the public trust and the advancement of the tripartite mission of the University: to provide excellence in teaching, research, and public service. The Regents' principal offices are in Oakland, Alameda County, California. The University of California is the premier public university system in the world, providing undergraduate and graduate instruction

and degree programs to more than 285,000 students annually, including roughly 37,500 students who study in the United States pursuant to F-1 visas.

17.     Defendant United States Department of Homeland Security is an Executive Department of the United States and an agency within the meaning of 5 U.S.C. § 551(1). DHS, as well as its component agency U.S. Immigration and Customs Enforcement, or ICE, has responsibility for, among other things, administering and enforcing the nation's visa laws and policies, including the "F-1" visa program.

18.     Defendant ICE is a component agency within the United States Department of Homeland Security and also an agency within the meaning of 5 U.S.C. § 551(1). ICE has responsibility for, among other things, administering and enforcing the nation's visa laws and policies, including the Student and Exchange Visitor Program ("SEVP") and the "F-1" visa program.

19.     Defendant Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security. He is sued in his official capacity.

20.     Defendant Matthew Albence is the Acting Director of United States Immigration and Customs Enforcement. He is sued in his official capacity.

## **JURISDICTION**

21.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 702. Plaintiff The Regents of the University of California is a juridical person aggrieved by a final agency action promulgated by Defendants. *See* 5 U.S.C. § 702. The Regents brings this suit for declaratory and injunctive relief to set aside Defendants' action as contrary to law and arbitrary and capricious, *see id*. §§ 705, 706. This case presents a federal question under 28 U.S.C. § 1331 and thus is properly brought in the federal district courts.

## **VENUE**

22.     Venue is proper in the Northern District of California because this is a civil action in which Defendants are agencies, or officers of an agency, of the United States. The Regents' resides in this District, and no real property is involved. 28 U.S.C. § 1391(e)(1).

**INTRA-DISTRICT ASSIGNMENT**

23.     Pursuant to Civil Local Rule 3-2(c), intra-district assignment is proper in San Francisco or Oakland, because a substantial part of the events or omissions which give rise to the claims occurred in the County of Alameda.

24.     The Regents has standing to bring this case. Unless enjoined by this Court, Defendants' actions will cause an imminent, concrete, and irreparable injury to The Regents' finances and its ability to carry out its educational mission, and will pose unacceptable health risks to The Regents' faculty and others in its campus communities.

25.     This Court is authorized to grant the requested injunctive relief pursuant to Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705.

**FACTS**

**The COVID-19 Pandemic**

26.     The President of the United States declared a national emergency in response to the COVID-19 pandemic on March 13, 2020.

27.     SARS-CoV-2, which causes the COVID-19 illness, is easily transmitted. As of the filing of this Complaint, there have been more than 3.1 million confirmed cases in the United States alone, and more than 133,000 deaths from confirmed cases. California has recorded over 300,000 confirmed cases, and over 6,800 COVID-19-related deaths. Confirmed cases and deaths from COVID-19 have increased exponentially in the United States since January 2020, continue to grow in number, and are expected to continue to increase markedly over the coming months.

28.     The virus that causes COVID-19 is highly transmissible and humans have no preexisting immunity. Those who contract the virus may experience life-threatening symptoms, significant and long-lasting health consequences, and in some cases death. Survivors face prolonged recovery, extensive rehabilitation, loss of digits, permanent neurological damage, and irreversible loss of respiratory capacity.

29.     Carriers of the virus are often asymptomatic or pre-symptomatic, making testing or seclusion of only symptomatic individuals an ineffective solution for preventing the spread of the virus.

30.     There is no vaccine against COVID-19. The most effective risk-mitigating measure is to limit community spread by physical distancing, or remain physically separated from known or potentially infected individuals; vigilant sanitation and hygiene are equally important.

31.     Close human-to-human contact, especially indoors, poses the greatest risk of transmission. University campuses present particular risks, including crowded classrooms, dining facilities, and dormitories, which, until the pandemic subsides and an effective vaccine is developed, could lead to further large-scale outbreaks of COVID-19.

32.     The most severe projections from the CDC estimate that more than 200 million people in the United States could be infected with the novel coronavirus over the course of the pandemic, with as many as 1.5 million deaths.

33.     Efforts to contain the spread of this highly contagious disease have included broad shutdowns of businesses, educational institutions, and other aspects of society. On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising individuals to adopt stringent physical distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, gyms, food courts, sporting events, and concerts.[6]

34.     Following this advice, many states, including California, took steps to protect the health and safety of their residents. States issued orders suspending or severely curtailing operations of non-essential businesses, schools, and other locations where individuals congregate. Many local governments also took action. Indeed, local governments in California—including localities in which University of California campuses operate—were among the first in the nation to recognize the need to take decisive action, and to that end issued "stay-at-home" orders or the like to protect their residents and economies.

35.     Notwithstanding these mitigation measures, COVID-19 cases continue to rise precipitously nationwide and in California, particularly since the Memorial Day holiday.  Current

---

[6] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

guidance from California reflects a general policy of continued caution, and a particular concern with indoor gatherings.[7] California's continued concern is well-warranted. States such as Florida, Texas, South Carolina, Louisiana, and Arizona, all of which have relaxed physical distancing measures—including by allowing indoor gatherings and the opening of locations where individuals congregate—are now suffering renewed surges and record-setting numbers of COVID-19 cases, hospitalizations, and deaths.

36.     To date, there have been more than 3.1 million confirmed cases of COVID-19 in the United States, which have caused more than 133,000 deaths.[8]

### ICE's Initial Response to the Pandemic

37.     Most international students in the United States attend American universities pursuant to nonimmigrant F-1 visas. Eligibility to maintain their status is governed by 8 C.F.R. § 214.2.

38.     By regulation, F-1 visa-holders must pursue a "full course of study" while in the United States.  8 C.F.R. § 214.2(f)(5)(i).

39.     Section 214.2 defines the extent to which online courses can help satisfy the "full course of study" requirement. Since 2003, 8 C.F.R. § 214.2(f)(6)(i)(G) has provided: "For F-1 students enrolled in classes for credit or classroom hours, no more than the equivalent of one class or three credits per session, term, semester, trimester, or quarter may be counted toward the full course of study requirement if the class is taken on-line or through distance education and does not require the student's physical attendance for classes, examination or other purposes integral to completion of the class. An on-line or distance education course is a course that is offered principally through the use of television, audio, or computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer

---

[7] *See generally* Stay Home Q&A, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (last visited July 10, 2020).

[8] Coronavirus in the U.S.: Latest Map and Case Count, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html  (last visited July 10, 2020).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

conferencing. If the F-1 student's course of study is in a language study program, no on-line or distance education classes may be considered to count toward a student's full course of study requirement."

40.     On March 13, 2020, the Student and Exchange Visitor Program ("SEVP"), a division of ICE, recognizing the extraordinary circumstances posed by the pandemic and responding to "inquiries concerning the proper status" of international students in the United States on academic visas "who may have [to] face slightly different scenarios related to emergency procedures implemented by SEVP-certified learning institutions," issued guidance to address F-1 students' maintenance of their F-1 visa status during the national emergency (the "March 13 Guidance").[9]

41.     As relevant here, the March 13 Guidance governs international students attending a school that "temporarily stops in-person classes but implements online or alternate learning procedures." The Guidance instructed students to "participate in online or other alternate learning procedures and remain in active status" with ICE. Accordingly, under the Guidance, international students with F-1 visas could engage in remote learning programs, even a complete course of study through remote learning, so long as it was implemented as a result of the pandemic—either in the United States or abroad—without adversely affecting their F-1 visa status.

42.     The March 13 Guidance expressly stated that, though it was a "temporary provision," it would remain *"in effect for the duration of the emergency.*" (Emphasis added.) ICE also noted that the situation was "*fluid*" and "*difficult*" and acknowledged that "SEVP will continue to monitor the COVID-19 situation and will adjust its guidance *as needed*." (Emphases added.)

43.     The President's national emergency declaration of March 13, 2020 remains in effect. Indeed, the COVID-19 pandemic is worsening in much of the nation; daily COVID-19

---

[9]
https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

1  cases in much of the United States never significantly decreased, and cases of infection are now

2  increasing dramatically in a majority of States.[10]

3  **The Regents of the University of California's Response to the Pandemic**

4      44.    Campuses across the University of California system moved to online instruction

5  in March 2020. In the ensuing months, University of California campuses each individually

6  engaged in careful, deliberate planning processes, prioritizing the health and safety of students,

7  faculty, and staff, as well as the University's purpose to deliver world-class educational services

8  and a meaningful university experience to their students notwithstanding the pandemic. The

9  University of California schools undertook these actions, among other reasons, in reliance on

10  ICE's statements in the March 13 Guidance that, because of the pandemic, students with F-1 visas

11  would not be required to attend in-person classes to retain their visa status and that the exemption

12  would remain "in effect for the duration of the [COVID-19 national] emergency."

13      45.    The Regents has put considerable thought, effort, and resources into devising how

14  best to advance the University's educational mission in the midst of the ongoing global pandemic.

15  On May 22, 2020, recognizing the potential need to dramatically transform on-site operations, the

16  University released the "University of California Consensus Standards for Operation of Campus

17  and ANR Locations in Light of the SARS-CoV-2 Pandemic." Numerous working groups and task

18  forces were also formed to assess and discuss responses to the pandemic. The University has

19  continuously monitored statewide and local government data regarding COVID-19 and abided by

20  reopening requirements and shelter-in-place restrictions. All ten campuses have created plans for

21  their summer and fall 2020 classes based on the status of COVID-19 in their respective locations.

22  These plans often include a commitment to provide students, faculty, and staff with face

23  coverings and to implement social distancing and COVID-19 testing requirements where feasible.

24      46.    The University of California has also consulted on an ongoing basis with

25  epidemiologists, medical experts, industry experts, and others on a wide range of topics related to

26

27      [10] https://coronavirus.jhu.edu/data/new-cases-50-states (as updated on Friday, July 10, 2020 at 03:00 AM EDT).

28

protecting student and public health while continuing to educate students. Indeed, some of the world's foremost experts on these topics work at the University of California.

47. Following months of study and consultation, the University's campuses have dramatically transformed their approach to the fall 2020 semester: UC Berkeley intends to conduct limited in-person classes; UC Davis plans to offer most courses remotely; Irvine courses will be remote with minimal exceptions; UCLA is currently all-remote, but anticipates 15-20% of courses will be in-person or in a hybrid format for the 2020-21 academic year; UC Merced will be nearly all remote, only allowing those classes that are by their nature hands-on to proceed in-person; UC San Diego hopes for 30% in person classes, with 70% remote or hybrid. In short—classes will be remote for most courses and students on every campus.

48. Any increase of in-person sessions will increase the risk to faculty, staff, students, and the broader university community of contracting COVID-19.

49. Most faculty members are able to provide instruction remotely and would be put at increased risk of contracting COVID-19 by increased in-person sessions.

50. A substantial number of the University's faculty are over 60 years of age. According to the CDC, older adults are among those at the highest risk of suffering severe illness from COVID-19: such individuals are, according to the CDC, more likely to "require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[11]

51. The University of California intends that its faculty members focus on providing robust and meaningful learning experiences through remote instruction. Requiring faculty to plan at this late date for a potential adjustment to greater on-campus instruction, with all its attendant health risks of having larger numbers of people on campus and in classrooms, would disrupt that focus and likely result in a less-prepared instructional experience for the University's students, whether domestic or international.

52. Were the University's campuses coerced by ICE into increasing the number of in-person sessions to satisfy the July 6 Directive's strictures for allowing their international students

---

[11] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

to remain in good standing under the F-1 visa program, it would also increase the health risk to staff members—including facilities workers, janitorial staff, support staff, and others—through increased interactions with potentially infected students, faculty, and staff. This, in turn, would risk exacerbating the spread of the virus across California.

53.    All students, whether domestic or international, will also be at an increased risk of contracting COVID-19 if the University of California system is coerced to provide more in-person sessions this coming term.

54.    International students, many of whom have already incurred substantial, irretrievable costs associated with attending college in the United States in the 2020-2021 academic year, relied on the March 13 Guidance when they incurred those costs. For instance, many international students have already taken out loans to pay for their education and related expenses, made travel arrangements to move to or near campuses, and entered leases for housing.

**ICE Abruptly Announces It Will End The COVID-19 Exemptions**

55.    Notwithstanding ICE's statement in its March 13 Guidance that the exemption from the in-person education provision of section 214.2 would remain "in effect for the duration of the emergency," and also notwithstanding the above-described actions of the University and its students taken in reliance on those express statements, on June 4, 2020, ICE issued a "Frequently Asked Questions" ("FAQ") document[12] asserting that "SEVP has *not* issued guidance to international students and schools for the fall semester." (Emphasis added.) No further explanation of this cryptic statement was provided. Its intent only became clear a month later, with the issuance of the July 6 Directive.

56.    On July 6, 2020, without *any* advance notice or opportunity for comment, and without giving students or universities *any* meaningful indication that it was considering revising the policy set out in its March 13 Guidance,[13] ICE issued the "July 6 Directive," which an

---

[12] https://www.ice.gov/doclib/coronavirus/covid19faq.pdf.

[13] Section 553(b) of the Administrative Procedure Act, 5 U.S.C. § 553(b), requires that "notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include-
(Continued…)

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

accompanying "News Release" describes as announcing "modifications … to temporary exemptions for nonimmigrant students taking online classes due to the pandemic for the fall 2020 semester."[14]

57.     In the July 6 Directive, ICE re-characterized its March 13 Guidance, saying that, in that earlier guidance, "SEVP instituted a temporary exemption regarding the online study policy for the *spring and summer* semesters" (emphasis added). Nothing in the March 13 Guidance, however, says anything about its exemption being limited to the spring and summer 2020 semesters. Quite to the contrary, the March 13 Guidance stated very clearly that it would remain "in effect *for the duration* of the emergency." (Emphasis added.)

58.     The July 6 Directive provides that: "Nonimmigrant F-1 … students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States. The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States." (Emphasis in original.)

59.     Moreover, the July 6 Directive instructs that "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status. If not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings."

60.     The July 6 Directive indicates that, regardless of the label ICE applies to it, ICE intends its *content* to have the force and effect of a final rule. The Directive expressly states the "U.S. Department of Homeland Security plans to publish the procedures and responsibilities in the below Broadcast Message in the near future *as a Temporary Final Rule* in the Federal

---

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or the substance of the proposed rule or a description of the subjects and issues involved.

*None* of that occurred with respect to the July 6 Directive.

[14] https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-

Register." (Emphasis added.) As of the filing of this Complaint, the Directive's procedures and responsibilities have not yet been published in the Federal Register.

61.     The July 6 Directive further instructs that "[s]chools that offer ***entirely online classes or programs or will not reopen*** for the fall 2020 semester must complete an operational change plan and submit it to" ICE "no later than Wednesday, July 15, 2020." (Emphasis in original.)

62.     Moreover, the July 6 Directive states that "[s]tudents attending schools offering a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online," but also instructs that the school must, for each such student, "certify to SEVP, through the Form I-20, 'Certificate of Eligibility for Nonimmigrant Student Status,' that the program is not entirely online, that the student is not taking an entirely online course load this semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." Compliance with this proviso requires that each institution issue a new Form I-20 for *each* of its potentially thousands of F-1 visa-holding students, who within the University of California total approximately 37,500 students system-wide. Further, it instructs that each institution must undertake this extraordinarily burdensome task within 21 business days of July 6—that is, by August 4, 2020. Doing so within such a short period of time is not only unduly burdensome, but, in most cases will be impossible because many of the University's students are generally not required to register for particular classes until much closer to the start of the semester. Thus, the University is not likely to know by the August 4 deadline which international students will, and which will not, qualify as being engaged in a hybrid course of study or whether that study meets the Directive's requirements for continued exemption from the regulations' in-person study requirements.

63.     The July 6 Directive is unaccompanied by any explanation whatsoever for ICE's rescission of the exemption in the March 13 Guidance, even though that prior Guidance was, per ICE's own statements, intended to continue in effect for the duration of the COVID-19 emergency. Neither the July 6 Directive nor its accompanying "News Release" or updated FAQ document indicates that ICE considered in any way the factors relevant to its decision to coerce

1   international students to attend classes in person as a condition of maintaining their F-1 visa

2   status—including whether their school has decided to (or the host state, county, or municipality

3   has required that the school) provide classes online to safeguard the health of students, faculty,

4   staff, and the surrounding community.

5          64.     Simply stated, the July 6 Directive reveals no consideration whatsoever by ICE of

6   its impact on the health of students, faculty, staff, or the surrounding communities.

7          65.     Further, ICE's action of July 6 accounts for neither the ongoing reality of the

8   COVID-19 pandemic nor the record numbers of infections that are reported daily across the

9   United States.

10          66.     The July 6 Directive also does not account in any way for the reliance interests of

11   both students and universities on ICE's statements on the March 13 Guidance, or that the

12   exemptions ICE announced in that March guidance were a result of the extraordinary COVID-19

13   pandemic and therefore would be "in effect for the duration of the [COVID-19 national]

14   emergency." As noted, the July 6 Directive attempts unsuccessfully to re-characterize the March

15   13 Guidance as having been applicable only to "the spring and summer semesters," despite the

16   fact that the March 13 Guidance does not say that and instead says something quite the opposite:

17   that the exemption would apply *for the duration* of the public health emergency.

18          67.     In fact, the July 6 Directive describes the exemptions established in the March 13

19   Guidance as allowances that were made "*during the height* of the Coronavirus Disease (COVID-

20   19) crisis" (emphasis added)—entirely disregarding the fact that the present rate of documented

21   infections in the United States far exceeds the rate of infections in March. And that rate continues

22   to climb, precipitously, in most areas of the country.

23          68.     ICE also did not consider the absence of or risks associated with other options by

24   which universities affected by the COVID-19 pandemic and concerned for their students' and

25   faculty's health and welfare might provide their curricula safely and effectively to students,

26   including F-1 students.

27          69.     The July 6 Directive will harm continuing F-1 students immeasurably. For many

28   students affected by the July 6 Directive, it will be infeasible or impossible to transfer to another

1    program that offers an in-person curriculum, thereby allowing them to pursue their education

2    from within the United States on F-1 visa status. Thus, these students will likely be forced to

3    leave the country. For many, this means the disruption of years of study and investment in the

4    program they must now leave mid-stream. The consequences of this sudden displacement, for

5    both new and continuing international students, are both financial and personal, and in all events

6    are likely to be devastating. These students will now be forced to incur substantial expenses to

7    make international flight arrangements in the midst of a pandemic that has significantly reduced

8    the availability of air travel. They will also lose their homes, in many instances at great cost

9    associated with leases that must now be broken. Not only that, but the many affected students

10   who are parents of children will be forced to upend their children's lives by returning to their

11   home countries, and affected students with spouses in the United States on some other type of

12   visa, such as a work visa, are at risk of being torn away from their spouse (and children where

13   applicable) in order to comply with the July 6 Directive.

14          70.     For continuing F-1 visa students enrolled in a hybrid program who are currently

15   outside of the United States, if the students cannot return to the United States either due to travel

16   restrictions or an inability to get an F-1 entry visa because of the suspension of consular

17   processing of visa applications—which suspension was instituted in response to the COVID-19

18   emergency and remains in effect to this day—these students will lose their F-1 status by the terms

19   of July 6 Directive. In turn, these students would lose their ability to pursue pre-completion

20   internship and experiential learning opportunities, as well as their eligibility for work allowances

21   in summer and fall 2021, because of the requirement that students maintain F-1 status for the full

22   academic year preceding their access to practical training. *See* 8 C.F.R. § 214.2(f)(10).

23          71.     F-1 students enrolled in a fully online program *cannot* lawfully remain in the

24   United States to continue their studies under the July 6 Directive. Unless this Court enjoins

25   implementation of the July 6 Directive, these students will be required to make precipitous

26   arrangements to return to their home countries amid a worldwide pandemic that has caused

27   nations to close their borders (particularly to residents of the United States, where infection rates

28   are higher than in many other countries) and that has considerably limited international travel

options. And if their departure is not timely, these students risk detention by immigration authorities and formal removal from the United States, which may bar their return to the United States for ten years. 8 U.S.C. § 1182(a)(9).

72.     While some international students could attempt to participate in their university's online educational program from outside the United States, they may have their research and learning opportunities inhibited by time zone variations; unavailable, unreliable, or state-restricted Internet connections; and other barriers to online learning. Still other students simply cannot participate in online learning in their home countries. For example, University of California students hail from countries such as Syria, Somalia, and Yemen, where civil war and ongoing humanitarian crises make Internet access and study all but impossible. Others come from Ethiopia, where the government has a practice of suspending all Internet access for extended periods, including for a period that started on June 30, 2020, and continues to this date. At least one student hails from North Korea, a country notorious for its repression of its citizens and the suppression of the free flow of information.  In some or all of these circumstances, attempting to access their education through remote, online means may even pose dangers to their safety.

73.     Further, the value of the education offered by Plaintiff hinges in many cases on the diversity of perspective offered by these international students. Rendering their participation impossible or insignificant will impair the educational experience and diminish its value for *all* University of California students. Moreover, the University of California system depends on F-1 graduate students to provide teaching support in many undergraduate programs. Requiring these students to provide instruction from remote locations in their home countries or elsewhere abroad, potentially with considerable time-zone disparities and variable Internet connectivity, will make it harder for faculty to coordinate with their teaching aides and benefit fully from their teaching contributions.

74.     The July 6 Directive will make continued study at University of California institutions impracticable for a significant portion of their F-1 visa students. The loss of the ability to perform research or field work, or even participate in basic coursework under reasonable conditions, will force many students to abandon or at least postpone their studies for years. Many

students risk losing their ability to access work allowances due to the requirement that students maintain F-1 status for the full academic year preceding their access to practical training. *See* 8 C.F.R. § 214.2(f)(10). This will significantly disrupt those students' career plans and opportunities, further undermining the value of the educational experience that the University's campuses can provide. It can be reasonably expected that the July 6 Directive will lead many students to take extended leaves of absence or withdraw from the University's campuses entirely. This harms everyone—the student, the University, and the people here and abroad who otherwise might have benefited from that person's university-gained expertise.

75.    The July 6 Directive will also cause immense harm to the University of California. Many curricular programs depend on the presence and diversity of international students.

76.    Moreover, F-1 students' tuition payments account for a significant percentage of the University's overall revenues, and they help make possible the provision of financial aid to those domestic students who could not otherwise afford to attend a University of California institution of higher education. The disenrollment of any substantial number of these international students would likely have a profound adverse effect on the University's ability to continue to provide the world-class educational programs for which it is known and on its ability to offer access to those who could not otherwise afford to attend.

77.    Loss of out-of-state tuition will similarly undermine research at University of California campuses. At UCLA, for example, absent out-of-state tuition from international students, the campus will not have sufficient revenue to support the remaining graduate student researchers.  And the impact on research writ large will be catastrophic. At UCLA, one out of five graduate students is an international student, with particular concentrations in the science, engineering, and medical departments, areas of study in which most research cannot be done remotely. The sudden removal, absent intervention by this Court, of a principal investigator on such a project would be hugely detrimental, particularly given the importance of research in these fields to better understanding SARS-CoV-2.

78.    The harm to research caused by the July 6 Directive will be long-lasting, unless enjoined by this Court, as international students will be discouraged from enrolling at the

University. A declination in the number of international students coming to the United States will, for the reasons noted, greatly undermine future research and teaching efforts at University of California campuses.

79.     By threatening to force many F-1 students to withdraw from the University of California system, ICE has given the University and its campuses an untenable choice: lose numerous students who bring immense benefits to the University, or take steps to retain them through in-person classes, even when those steps increase the risk to the health of the students, faculty, staff, and the entire university community during the continuing COVID-19 pandemic.

80.     Indeed, the Administration has effectively acknowledged that ICE's decision is designed to force universities and other educational institutions to conduct in-person classes notwithstanding universities' and public health officials' considered judgments that it is neither safe nor educationally advisable to do so.[15] As Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli stated on July 7, 2020, the ICE Directive "will … encourage schools to reopen."[16]

## CLAIMS FOR RELIEF

### Count I (Violation of Administrative Procedure Act, 5 U.S.C. § 706)
### *The July 6 Directive Is Arbitrary And Capricious*

81.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

82.     The APA requires that this Court hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action that is not the product of reasoned decision making is inherently arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). And an agency that "entirely fail[s] to consider an important aspect of the problem" before it acts in an arbitrary and capricious manner when it

---

[15] https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20.

[16] https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international- students-to-return-home.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT
CASE NO. TBA

1    finalizes its action. *Id.; see also Department of Homeland Sec. v. Regents of the Univ. of Calif.*,

2    No. 18-587, 2020 WL 3271746, at *13 (U.S. June 18, 2020).

3           83.    The July 6 Directive is arbitrary and capricious because it "entirely fail[s] to

4    consider … important aspect[s] of the problem" before ICE.  *State Farm*, 463 U.S. at 43.  At the

5    outset, Plaintiff notes that the July 6 Directive contains no explanation whatsoever for ICE's

6    rescission of the March 13 Guidance. It reflects no consideration of the Directive's significant

7    effects on universities and other institutions of higher education, many of which expended

8    considerable time and effort balancing community health and safety with core educational

9    pursuits in devising plans for the 2020-21 academic year. The July 6 Directive similarly fails to

10   consider the utter havoc it will wreak on the international students it most directly affects—who

11   will be forced to leave the United States or will be unable to enter to take classes, or who will not

12   be able to return to their home country, or possibly any other, or the diminution in the value of the

13   education that the universities can provide to *any* students in the absence of a significant number

14   of international students and the unique perspectives they bring.

15          84.    The July 6 Directive is also arbitrary and capricious because it "fail[s] to address"

16   the "serious reliance interests" that ICE's prior Guidance on this issue engendered. *Regents*, 2020

17   WL 3271746, at *14. As the Supreme Court explained just days ago, "[w]hen an agency changes

18   course, as DHS did here, it must be cognizant" of "serious reliance interests" that its prior

19   approach has "engendered." *Regents*, 2020 WL 3271746, at *14. "It would be arbitrary and

20   capricious to ignore such matters." *Id*. Yet the July 6 Directive does precisely this. It departs from

21   prior guidance that ICE issued with respect to maintaining an active F-1 student visa during the

22   COVID-19 health crisis—including its explicit statement on March 13 that the COVID-19-related

23   exemptions for F-1 visa holders would remain "in effect for the duration of the emergency"—

24   without *any* reasoned basis (indeed, without any stated basis whatsoever) for ICE's sudden

25   reversal of position.

26          85.    Not only does the July 6 directive fail to account for its devastating effect on

27   students and universities, but it fails to proffer any reasoned basis that could justify such an abrupt

28   policy shift.  To satisfy the core requirement of reasoned decision-making, an agency must

"cogently explain why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 448.

86.     The July 6 Directive, which reflects no reasoned decision-making whatsoever, flouts this basic statutory requirement. It identifies a purported "need to resume the carefully balanced protections implemented by federal regulations," but provides no reasoning why the agency perceives such a need to exist, nor why any resumption of the regime set out in federal regulations must begin in less than two months, while the COVID-19 pandemic continues to rage and worsen and the national state of emergency remains in effect.

87.     Indeed, the lack of any real justification for the July 6 Directive on its face "reveal[s] a significant mismatch between the [July 6 Directive] and the rationale … provided," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2775 (2019), raising the prospect that the July 6 Directive is being used for no other purpose than to, purely for political reasons, coerce universities to alter their plans for the fall. Statements by administration officials such as Acting Deputy Secretary Kenneth Cuccinelli, quoted earlier, bear this out.

88.     The July 6 Directive is patently "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, it must be set aside.

**Count II (Violation of Administrative Procedure Act, 5 U.S.C. §§ 553, 706)**

***The July 6 Directive Violates The APA's Requirement Of Notice-And-Comment Rulemaking***

89.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

90.     The APA requires this Court to hold unlawful and set aside agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

91.     The APA, 5 U.S.C. § 553, requires (with certain exceptions not applicable here) that agencies publish notice of any proposed substantive rule in advance in the Federal Register, and that the public be given an opportunity to comment on that proposed rule before it is finalized and takes effect. That Federal Register notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or the substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b).

92.     The July 6 Directive was not noticed in advance, provided none of the information required by § 553(b), and provided no opportunity for public comment whatsoever.

93.     The July 6 Directive issued by ICE is a "rule" within the meaning of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4). ICE all but concedes this: it openly states in the Directive that it intends in the near future to publish the Directive's "procedures and responsibilities" in the Federal Register as a "Temporary Final Rule."

94.     The July 6 Directive is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. § 553(b). To the contrary, it is a substantive rule that alters students' and universities' rights and obligations under the law by requiring that students who are F-1 visa holders either transfer to an institution offering in-person classes and attend those in-person classes, or leave the country, and by prohibiting the return to the country of F-1 visa holders who cannot meet the Directive's requirements.

95.     Absent "good cause" for not doing so, ICE was required to provide notice of its proposal in the Federal Register, an opportunity for public comment on the proposal, and an explanation of the rule ultimately adopted, as well as a response to the comments it received, see 5 U.S.C. § 553(b), (c)—none of which it has done. Agencies cannot "avoid notice and comment simply by mislabeling their substantive pronouncements." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019).

96.     ICE has made no reasoned "good cause" finding for failing to follow the APA's procedural requirements here, nor could it.

97.     Because ICE promulgated the July 6 Directive without notice and an opportunity for comment, in violation of 5 U.S.C. § 553, it and the modifications it announced are unlawful and must be vacated.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully seeks the following relief:

1.     A declaration that the policy announced in the July 6 Directive is arbitrary and capricious;

2.      An order vacating and setting aside the policy announced in the July 6 Directive and reinstating the March 13 Guidance;

3.      An order preventing Defendants from enforcing the policy announced in ICE's July 6 Directive, or promulgating it as a Final Rule or "Temporary Final Rule," without at least first providing notice and an opportunity for public comment;

4.      An order awarding Plaintiff's costs and attorney's fees; and

5.      Any and all other such relief as the Court may deem appropriate.

Dated: July 10, 2020

Respectfully submitted,

CROWELL & MORING LLP

By: */s/ Jennifer S. Romano*

Jennifer S. Romano (SBN 195953)
jromano@crowell.com
Emily T. Kuwahara (SBN 252411)
ekuwahara@crowell.com
Crowell & Moring LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071
Telephone: 213.622.4750

Molly A. Jones (SBN 301419)
mojones@crowell.com
CROWELL & MORING LLP
3 Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: 415.986.2800

Thomas A. Lorenzen (*pro hac vice* forthcoming)
tlorenzen@crowell.com
Daniel W. Wolff (*pro hac vice* forthcoming)
dwolff@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone: 202.624.2500

Charles F. Robinson (SBN 113197)
charles.robinson@ucop.edu
Margaret L. Wu (SBN 184167)
margaret.wu@ucop.edu
Allison M. Woodall (SBN 178533)
Allison.woodall@ucop.edu
Sonya U. Sanchez (SBN 247541)
sonya.sanchez@ucop.edu
UNIVERSITY OF CALIFORNIA
OFFICE OF THE GENERAL COUNSEL
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: 510.987.9800

*Attorneys for Plaintiff*
*THE REGENTS OF THE UNIVERSITY OF*
*CALIFORNIA*

# Exhibit 1

**Broadcast Message: COVID-19 and Fall 2020**

**To:** All SEVIS Users

**Date:** July 6, 2020
**Number:** 2007-01

---

**General Information**

Temporary procedural adaptations related to online courses permitted by the Student and
Exchange Visitor Program (SEVP) during the height of the Coronavirus Disease (COVID-19)
crisis will be modified for the fall 2020 semester. There will still be accommodations to provide
flexibility to schools and nonimmigrant students, but as many institutions across the country
reopen, there is a concordant need to resume the carefully balanced protections implemented by
federal regulations. The U.S. Department of Homeland Security plans to publish the procedures
and responsibilities described in the below Broadcast Message in the near future as a Temporary
Final Rule in the Federal Register. This message is intended to provide additional time to
facilitate the implementation of these procedures.

Due to COVID-19, SEVP instituted a temporary exemption regarding the online study policy for
the spring and summer semesters. This policy permitted F and M students to take more online
courses than normally allowed for purposes of maintaining a full course of study to maintain their
F-1 and M-1 nonimmigrant status during the COVID-19 emergency.

**Temporary Exemptions for the Fall 2020 Semester**
For the fall 2020 semester, SEVP is modifying these temporary exemptions. In summary,
temporary exemptions for the fall 2020 semester provide that:

1) Students attending schools operating entirely online may ***not*** take a full online course load
   and remain in the United States. The U.S. Department of State will not issue visas to students
   enrolled in schools and/or programs that are fully online for the fall semester nor will U.S.
   Customs and Border Protection permit these students to enter the United States. Active
   students currently in the United States enrolled in such programs must depart the country or
   take other measures, such as transferring to a school with in-person instruction to remain in
   lawful status or potentially face immigration consequences including, but not limited to, the
   initiation of removal proceedings.

2) Students attending schools operating under normal in-person classes are bound by existing
   federal regulations. Eligible F students may take a maximum of one class or three credit
   hours online (*see 8 CFR 214.2(f)(6)(i)(G)*).

3) Students attending schools adopting a hybrid model—that is, a mixture of online and in
   person classes—will be allowed to take more than one class or three credit hours online.
   These schools must certify to SEVP, through the Form I-20, "Certificate of Eligibility for
   Nonimmigrant Student Status," that the program is not entirely online, that the student is not
   taking an entirely online course load for the fall 2020 semester, and that the student is taking

the minimum number of online classes required to make normal progress in their degree program.  The above exemptions do not apply to F-1 students in English language training programs or M-1 students, who are not permitted to enroll in any online courses (see *8 CFR 214.2(f)(6)(i)(G)* and *8 CFR 214.2(m)(9)(v)*)).

**Forms I-20 Requirements and Maintaining Student Records for the Fall 2020 Semester**

For all students attending schools in the United States this fall 2020, designated school officials (DSOs) must issue new Forms I-20 to each student certifying that the school is not operating entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program. DSOs must indicate this information in the Form I-20 Remarks field in the Student and Exchange Visitor Information System (SEVIS).

Schools must update and reissue all Forms I-20 to reflect these changes in program enrollment and student information within 21 business days of publication of this Broadcast Message (by Aug. 4, 2020.) When issuing new Forms I-20, please prioritize students who require new visas and are outside of the country.

For the fall 2020 semester, continuing F and M students who are already in the United States may remain in Active status in SEVIS if they make normal progress in a program of study, or are engaged in approved practical training, either as part of a program of study or following completion of a program of study. If a school changes its operational stance mid-semester, and as a result a nonimmigrant student switches to only online classes, or a nonimmigrant student changes their course selections, and as a result, ends up taking an entirely online course load, schools are reminded that nonimmigrant students within the United States are not permitted to take a full course of study through online classes. If nonimmigrant students find themselves in this situation, they must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction.

For the fall 2020 semester, continuing F and M students outside of the United States, whose schools of enrollment are only offering online classes, may remain in Active status in SEVIS if they are taking online courses and are able to meet the normal full course of study requirements or the requirements for a reduced course of study. Only students enrolled at a school that is only offering online coursework can engage in remote learning from their home country. In this case, DSOs should annotate the student's record to make it clear that the student is outside the US but taking full time online courses as that is the only choice offered by the school.

**School Reporting and Procedural Requirements**

1) Schools that offer ***entirely online classes or programs*** or ***will not reopen*** for the fall 2020 semester ***must*** complete an operational change plan and submit it to SEVP@ice.dhs.gov no later than Wednesday, July 15, 2020. The subject line must read: "Fall 2020 (Fully Online/Will not Reopen) – School Name and School Code."

2) Certified schools that will not be entirely online but will reopen in the fall and that will use any of the following educational formats must update their operational plans by August 1, 2020 and include whether they will be:

- Solely in-person classes, or

- Delayed or shortened sessions, or

- A hybrid plan of in-person and remote classes.

These plans shall also be submitted to SEVP@ice.dhs.gov and the subject line must read: "Fall 2020 (in person/hybrid/modified session) – School Name and School Code

3) Schools should update their operational plans if circumstances regarding their operational posture change within 10 calendar days.

SEVP will continue to develop and provide resources to stakeholders on ICE.gov, including answers to frequently asked questions, to clarify and expand upon information in this Broadcast Message.

**Disclaimer**

This Broadcast Message is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil or criminal matter.

