1    Jennifer S. Romano (SBN 195953)
     JRomano@crowell.com
2    CROWELL & MORING LLP
     515 South Flower Street, 40th Floor
3    Los Angeles, California 90071
     Telephone:  213.622.4750
4
     A. Marisa Chun (SBN 160351)
5    MChun@crowell.com
     Molly A. Jones (SBN 301419)
6    MoJones@crowell.com
     CROWELL & MORING LLP
7    3 Embarcadero Center, 26th Floor
     San Francisco, California 94111
8    Telephone:  415.986.2800

9    Thomas A. Lorenzen (*pro hac vice* forthcoming)
     TLorenzen@crowell.com
10   Daniel W. Wolff (*pro hac vice* forthcoming)
     DWolff@crowell.com
11   CROWELL & MORING LLP
     1001 Pennsylvania Avenue, N.W.
12   Washington, D.C. 20004-2595
     Telephone: 202.624.2500
13
     (Additional counsel listed on signature page)
14
     Attorneys for Plaintiff
15   THE REGENTS OF THE UNIVERSITY OF CALIFORNIA

                    UNITED STATES DISTRICT COURT
16                  NORTHERN DISTRICT OF CALIFORNIA
17                  SAN FRANCISCO/OAKLAND DIVISION

18   THE REGENTS OF THE UNIVERSITY          Case No. 3:20-cv-04621
     OF CALIFORNIA, a California
19   Corporation,                           **PLAINTIFF'S EX PARTE MOTION FOR
                                            TEMPORARY RESTRAINING ORDER;
20              Plaintiff,                   MEMORANDUM OF POINTS AND
                                            AUTHORITIES IN SUPPORT THEREOF**
21        v.
                                            **[*Filed Concurrently with Ex Parte Application
22   UNITED STATES DEPARTMENT OF            to Shorten Time and Supporting Declarations*]**
     HOMELAND SECURITY; U.S.
23   IMMIGRATION AND CUSTOMS                Date:      July 14, 2020
     ENFORCEMENT; CHAD F. WOLF, in          Time:      TBD
24   his official capacity as Acting Secretary of   Ctrm:      TBD
     the United States Department of         Judge:     TBD
25   Homeland Security; and MATTHEW
     ALBENCE, in his official capacity as    Complaint filed:  July 10, 2020
26   Acting Director of U.S. Immigration and
     Customs Enforcement,
27
                Defendants.
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 2

II.   FACTUAL BACKGROUND ..................................................................................... 4

    A.    COVID-19 ..................................................................................................... 4

    B.    ICE's Initial COVID-19 Response .............................................................. 5

    C.    The University of California's COVID-19 Response ................................... 6

    D.    The Loss of International Students Enrolled Across Campuses Will have Substantial Adverse Effects Throughout the University System. ........................ 10

    E.    Students' Reliance on ICE's March 13 Guidance ................................... 11

    F.    ICE's Sudden and Arbitrary Rescission of the March 13 Guidance ..................... 12

III.  LEGAL STANDARD ............................................................................................... 13

IV.   Argument ................................................................................................................. 13

    A.    THE REGENTS ARE LIKELY TO SUCCEED ON THE MERITS ................... 16

        1.    The Regents Are Likely to Prevail on the First Cause of Action Under the APA Because the July 6 Directive is Arbitrary and Capricious. ............... 16

            a.    The Directive Failed to Offer a Reasonable Explanation for ICE's Policy Reversal. .............................................................. 16

            b.    The Directive Failed to Consider Important Aspects of the Problem, Including the Reliance of Plaintiff and Its Students on the March 13 Guidance. ................................................................. 17

            c.    Defendants Failed to Explain Any Basis for the Directive. ........... 20

        2.    The Regents Will Likely Prevail on Its Second APA Cause of Action, Because the Directive is a Substantive Rule that Did Not Comply with the APA's Notice and Comment Requirements ............................................ 22

    B.    THE REGENTS AND ITS STUDENTS ARE LIKELY TO SUFFER IRREPARABLE HARM ................................................................................. 23

    C.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF A TEMPORARY RESTRAINING ORDER. .......... 24

V.    CONCLUSION ......................................................................................................... 25

CROWELL
& MORING LLP
ATTORNEYS AT LAW

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ...................................................................................13, 25

*Amerijet Int'l, Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014)...................................................................................20, 21

*Butte Envt'l. Council v. U.S. Army Corps of Eng'rs,*
    620 F.3d 936 (9th Cir. 2010) ........................................................................................... 16

*SEC v. Chenery Corp. ("Chenery II"),*
    332 U.S. 194.................................................................................................................... 23

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ........................................................................................................ 23

*Ciox Health, LLC v. Azar,*
    435 F. Supp. 3d 30, 66 (D.D.C. 2020) ........................................................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ........................................................................................................ 16

*Colwell v. Dep't of Health & Human Servs.,*
    558 F.3d 1112 (9th Cir. 2009) ........................................................................................ 23

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) .............................................................................. 14, 15, 16, 17

*Enyart v. Nat'l Conference of Bar Examiners, Inc.,*
    630 F.3d 1153 (9th Cir. 2011) ........................................................................................ 24

*FCC v. Fox Telev'n Stns., Inc.,*
    556 U.S. 502 (2009) ........................................................................................................ 17

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................................................................ 16

*Humane Soc'y of U.S. v. Locke,*
    626 F.3d 1040 (9th Cir. 2010) ........................................................................................ 15

*Jicarilla Apache Nation v. U.S. Dep't of the Interior,*
    613 F.3d 1112 (D.C. Cir. 2010)................................................................................14, 17

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) .......................................................................................... 24

CROWELL
& MORING LLP
ATTORNEYS AT LAW

ii

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................ 16

*Nat'l Ass'n of Home Builders v. Norton*,
340 F.3d 835 (9th Cir. 2003) ........................................................................... 23

*Nat'l Res. Def. Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011) ........................................................................ 23

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ..................................................................................... 21

*Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) ........................................................................... 15

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ........................................................................................... 18

*Pimentel v. Dreyfus*,
670 F.3d 1096 (9th Cir. 2012) ......................................................................... 13

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) .................................. *passim*

*Republic of the Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988) ......................................................................... 13

*San Diego Air Sports Ctr., Inc. v. F.A.A.*,
887 F.2d 966 (9th Cir. 1989) ........................................................................... 23

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ........................................................................... 13

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ............................................................................................. 13

**Statutes**

5 U.S.C. § 553 ...................................................................................................... 3

5 U.S.C. § 553(b) ............................................................................................... 15

5 U.S.C. § 553(b), (c) ........................................................................................ 23

5 U.S.C. § 706(2)(A) ....................................................................................... 3, 16

5 U.S.C. § 706(2)(A), (D) ................................................................................. 14

5 U.S.C. § 706(2)(D) ...................................................................................... 3, 23

CROWELL
& MORING LLP
ATTORNEYS AT LAW

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

Administrative Procedure Act ............................................................................ *passim*

**Other Authorities**

8 C.F.R. § 214.2 ............................................................................................................ 5

8 C.F.R. § 214.2(f) ........................................................................................................ 5

8 C.F.R. §§ 214.2(f)(5)(i), 214(f)(6)(i)(G) ................................................................... 5

8 CFR 214.2(f)(6)(i)(G)… ............................................................................................ 6

*Emergency*, Executive Department, State of California,
     https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-
     SOE-Proclamation.pdf ....................................................................................... 5

Federal Rule of Civil Procedure 65(b) ........................................................................ 1

 "Guidance for SEVP Stakeholders" ("March 13 Guidance") ...................................... 5

, https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-
     forcing-international-students-to-return-home ................................................. 21

https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf ................................................ 5

https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%2
     0Guidance_3.13.20.pdf .......................................................................................... 6

https://www.universityofcalifornia.edu/news/university-california-born (last
     visited July 9, 2020) .............................................................................................. 6

John Bowden, *Cuccinelli says rule forcing international students to return home
     will 'encourage schools to reopen'* (July 7, 2020, 4:17 PM) ............................... 21

*Outbreak* (March 13, 2020), https://www.whitehouse.gov/presidential-
     actions/proclamation-declaring-national-emergency-concerning-novel-
     coronavirus-disease-covid-19-outbreak ................................................................ 5

*U.S.: Latest Map and Case Count*, N.Y. Times,
     https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last
     visited July 10, 2020) ............................................................................................ 4

United States' "F-1" ....................................................................................................... 2

University of California, https://www.universityofcalifornia.edu/infocenter/fall-
     enrollment-glance (last visited July 9, 2020) ....................................................... 6

CROWELL
& MORING LLP
ATTORNEYS AT LAW

iv

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

**NOTICE OF *EX PARTE* MOTION AND**

**MOTION FOR TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that on July 14, 2020, at __ a.m./p.m. or as soon thereafter as counsel may be heard, at the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102, or such other location assigned by the Court, Plaintiff The Regents of the University of California ("The Regents") will, and hereby does, move for a temporary restraining order against Defendants United States Department of Homeland Security, Acting Secretary of Department of Homeland Security Chad F. Wolf, United States Immigration and Customs Enforcement, and Acting Director of U.S. Immigration and Customs Enforcement Matthew Albence ("Defendants"), pursuant to Federal Rule of Civil Procedure 65(b).

The Regents seeks a temporary restraining order to enjoin Defendants from implementing the July 6, 2020 memorandum ("the Directive") issued by the Student and Exchange Visitor Program ("SEVP"), a division of the U.S. Immigration and Customs Enforcement ("ICE"). The Directive announced a reversal of prior ICE policy regarding the status of international students holding F-1 nonimmigrant student visas during the COVID-19 pandemic. The Directive instructs, *inter alia*, that "schools adopting a hybrid model – that is, a mixture of online and in person classes" must by August 4, 2020, certify to SEVP for each F-1 visa student that "the student is not taking an entirely online course load for the Fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."[1] Students for whom the school cannot so certify "must leave the country or take alternate steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction …."

The University of California has adopted a "hybrid model" for the Fall 2020 semester and thus must comply with the above requirements in less than a month to evaluate literally tens of thousands of students' courseloads and certify that each meets the Directive's requirements. This

---

[1] Further, certified schools that will not be entirely online but will reopen in the Fall must update and submit their operation plans to SEVP by August 1, 2020 as well.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905705894.8

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

will be impossible, as the University does not require students to commit to classes so long before the start of the educational year.  It is too late to alter that system now.

Plaintiff thus moves for this preliminary relief and will demonstrate that: (1) it is likely to succeed on the merits of its claims under the Administrative Procedure Act ("APA"); (2) Plaintiff and its domestic and foreign students are likely to suffer irreparable harm absent provisional relief; and (3) the balance of equities and the public interest weigh heavily in favor of returning to the status quo existing prior to the issuance of the Directive. Plaintiff's Motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities below; the currently available administrative record; the Alcocer, Beck, Byington, Christ, Deas, Schooley, and Wakimoto Declarations and exhibits submitted in support of this Motion; and such further evidence and argument as the Court may consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The University of California—renowned as the nation's premier public university system and as a world-class academic and research powerhouse and a key contributor to the California economy and social fabric—has long welcomed international students seeking to pursue unrivaled educational opportunities and, ultimately, their most cherished dreams. These students contribute to rich intellectual discourse across all disciplines, including in the University system's prized science, technology, engineering, and mathematics (STEM) departments, thereby also contributing to the University's mission of delivering and supporting world-class teaching and research, as well as to California's vibrant economy. For decades, the United States' "F-1" visa program for international, non-immigrant students has made all this possible.

In March 2020, faced with the unprecedented COVID-19 pandemic, The Regents moved swiftly to transition the University's ten campuses to remote teaching to protect the health and safety of their students and faculty, while continuing to meet its core mission of providing a world-class education. Also recognizing the unprecedented nature of the pandemic, defendant United States Immigration and Customs Enforcement ("ICE"), an agency within defendant the Department of Homeland Security ("DHS"), issued an exemption to a preexisting regulation that

CROWELL
& MORING LLP
ATTORNEYS AT LAW

2

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

required international students on F-1 visas to attend classes in person if they wished to remain in this country. ICE's March 13, 2020 Guidance (the "March 13 Guidance") provided critical assurances that international students could maintain their F-1 visa status while attending classes on-line "for the duration of the [COVID-19] emergency."

Without warning, on July 6, 2020, Defendants announced that they would largely rescind the COVID-19 exemption for students on F-1 visas and require such students whose universities had transitioned to an online-only curriculum to transfer to an institution offering in-person classes, or leave the United States. This Directive also effectively bars continuing students on F-1 visas who have already left this country from re-entering the United States, if they intend to take a full online course load in Fall 2020. This arbitrary, capricious, and procedurally defective agency action now forces The Regents to confront an untenable choice: to put its international students in immediate jeopardy of having to abandon their studies and leave the country or take steps to retain them by increasing the number of in-person courses offered for Fall 2020, thereby increasing the risk that its students, faculty, and staff will be exposed to the virus.

The Regents therefore seeks a temporary restraining order to enjoin Defendants from implementing the Directive. That Directive is not only unjust and unwise, but it violates the Administrative Procedure Act's ("APA") prohibition against agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action, like the Directive, purporting to have the force of law must be both reasonable and reasonably explained. Defendants also failed to satisfy the APA's notice-and-comment requirements for agency action that substantively affects rights or obligations, in violation of 5 U.S.C. § 553. *See* 5 U.S.C. § 706(2)(D) (authorizing the court to set aside agency action taken "without observance of procedure required by law"). The Regents, therefore, is likely to succeed on the merits. Further, it and its students will suffer irreparable harm absent relief. Finally, the balance of equities and the public interest strongly weigh in its favor. Accordingly, this Court should grant provisional relief enjoining Defendants from enforcing the Directive, thereby preserving the status quo pending adjudication of the University's motion for preliminary injunction and permanent relief.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

3

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

## II.   FACTUAL BACKGROUND

### A.   COVID-19

As the year began, the terms "novel coronavirus" and "COVID-19" meant nothing to most Americans. That soon changed. Since late 2019, when scientists first identified the novel coronavirus, or SARS-CoV-2, the virus that causes COVID-19 has spread to nearly every corner of the world: There are more than 12 million confirmed cases of the disease, and more than half a million people have died from it. Leading the pack is the United States, where there have now been more than 3.1 million confirmed cases and over 133,000 COVID-19-related deaths.[2] Moreover, because there is no vaccine for COVID-19, the forecast is grim. Epidemiologists predict that the domestic death toll from COVID-19 will exceed 200,000 by November. In California alone, there have been nearly 300,000 confirmed cases and over 6,500 deaths. Modeling from the Centers for Disease Control and Prevention ("CDC") suggests that as many as 200 million Americans could eventually be infected with COVID-19 and as many as 1.5 million Americans could die.

Certain basic facts about COVID-19 are not genuinely in dispute. For some, it causes symptoms requiring hospitalization or that are life-threatening. In the most severe cases, the virus is fatal. Overwhelming evidence indicates that the most likely means of transmission is through close contact, especially indoors. In light of these facts, state and local governments have implemented the only measures that reasonably can limit community spread of the virus— issuance of shelter-in-place orders, physical (social) distancing, closure of businesses and other venues where people may gather, diligent and regular sanitization and hygiene, and, where possible, contact tracing. Governor Newsom announced a state of emergency in California on March 4,[3] and the President of the United States declared a national emergency on March 13.[4] Yet the rate of infection today is considerably higher than it was in March.

---

[2] *See Coronavirus in the U.S.: Latest Map and Case Count*, *N.Y. Times*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 10, 2020).

[3] *Proclamation of a State of Emergency*, Executive Department, State of California, https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

4

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

**B.**    **ICE's Initial COVID-19 Response**

The federal government issues F-1 visas to international students who attend accredited American universities or other academic institutions on a full-time basis. 8 C.F.R. § 214.2(f). The requirements for F-1 visa holders are set forth in 8 C.F.R. § 214.2. That regulation states, in relevant part, that the student must take a full course of study and that no more than "one class or three credits" per semester or quarter may be counted toward the full course of study if the class is taken "on-line or through distance education." 8 C.F.R. §§ 214.2(f)(5)(i), 214(f)(6)(i)(G). However, in its initial response to the pandemic, ICE recognized the need for flexibility with respect to these requirements. In particular, on March 9, 2020, ICE's Student and Exchange Visitor Program ("SEVP") issued guidance ("March 9 Guidance") advising that "SEVP-certified schools may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis."[5] In issuing the guidance, ICE stated that it was "focused on ensuring that nonimmigrant students are able to continue to make normal progress in a full course of study" and that ICE would be "flexible with temporary adaptations," while further recognizing that "the COVID-19 crisis is fluid and rapidly changing." *Id.* Further, ICE's March 9 Guidance contemplated the necessity of "leaving room for schools to comply with state or local health emergency declarations." *Id.*

Just days later, on March 13, 2020, ICE issued further "Guidance for SEVP Stakeholders" ("March 13 Guidance") which provided, in relevant part:

> If a school closes temporarily but offers online instruction or another alternative learning procedure, nonimmigrant students should participate in online or other alternate learning procedures and remain in active status in SEVIS.... Given the extraordinary nature of the COVID-19 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess of the limits stated in 8 CFR 214.2(f)(6)(i)(G).... This temporary provision is only in effect for the duration of the emergency and in accordance with the

---

[4] *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

[5] *See* https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf ("March 9 Guidance") at p.1.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

5

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1    procedural change documents filed in a timely manner to SEVP.[6]

2    Further, according to its express terms, this Guidance applied to F-1 visa holders "even if they

3    have left the United States and are taking the online classes from elsewhere." *Id.* at 1-2.

4    **C.    The University of California's COVID-19 Response**

5            Founded in 1868, the University of California was founded upon a simple but audacious

6    idea: California should establish a great public university available to all—one that would serve

7    equally the children of immigrants and settlers, landowners and barons.[7] More than 150 years

8    later, the University today is one of the world's premier educational systems, comprising ten

9    campuses and educating more than 285,000 undergraduate and graduate students annually.[8]  True

10   to its founding principle, the University continues to be available to all—including approximately

11   37,500 F-1 visa students from across the globe. Decl. of Carol T. Christ ("Christ Decl.") ¶ 2.

12           Consistent with federal, state, and local guidance on preventing the spread of COVID-19,

13   and consistent with the March 9 and March 13 Guidances, the University undertook, with

14   substantial investment of time and resources,[9] to transition its academic curricula to online

15   instruction in March 2020. Since then, the University has engaged in careful, deliberate, and

16   iterative planning processes, prioritizing the health and safety of its entire academic community

17   and that of the surrounding communities, while also continuing to fulfill its mission of providing

18   world-class educational opportunities to all its students. Christ Decl. ¶¶ 2-6 & Exs. A&B; *see also*

19   Decl. of Robert T. Schooley ("Schooley Decl.") ¶ 15; Decl. of Carrie L. Byington ("Byington

20   Decl.") ¶¶ 4-6. The University made substantial investment in online solutions, in part based on

21   its reliance on ICE's March 13 Guidance that international students would not thereby be

22

23   [6]*See*
     https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.1
24   3.20.pdf at 1 ("March 13 Guidance").

25   [7] *See* https://www.universityofcalifornia.edu/news/university-california-born (last visited July 9, 2020).
     [8] *See Fall Enrollment at a Glance (2019),* University of California,
26   https://www.universityofcalifornia.edu/infocenter/fall-enrollment-glance (last visited July 9, 2020).

27   [9] The University of California estimates the cost of its COVID-19 response to date to be in the
     millions of dollars. Decl. of David Alcocer ("Alcocer Decl.") ¶ 10.
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905705894.8

6

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

precluded from maintaining their F-1 visa status during the COVID-19 crisis and that the exemption would remain "in effect for the duration of the emergency." *See* Alcocer Decl. ¶ 10. That emergency continues to this day and likely will for the foreseeable future.

The University has devoted considerable thought, effort, and resources to determine how best to advance its educational mission while protecting its students, faculty, and staff amidst the pandemic. The University and each campus have monitored state and local government data, recommendations, and directives regarding COVID-19 response and have abided by applicable reopening requirements and shelter-in-place restrictions. *See, e.g.,* Christ Decl. ¶¶ 6, 16 & Ex. A; Schooley Decl. ¶¶ 3-4, 7-8; Decl. of Deborah Deas ("Deas Decl.") ¶¶ 4-7.  The University and its campuses have also formed numerous working groups and task forces to assess and proactively plan responses to various scenarios potentially resulting from the pandemic. *See, e.g.,* Christ Decl. ¶¶ 4-9; Schooley Decl. ¶¶ 4, 15; Decl. of Deborah Deas ("Deas Decl.") ¶¶ 3-5; Decl. of Roger Wakimoto ("Wakimoto Decl.") ¶¶ 4-5; Decl. of Michael Beck ("Beck Decl.") ¶¶ 4-6.  For example, in February, researchers at UC San Diego ("UCSD") developed a dynamic compartmental transmission model of COVID-19 to simulate spread among the campus community to provide a quantitative framework for planning in response to the pandemic; they concluded that the University must limit all large-scale gatherings and limit the density of on-campus housing. Schooley Decl. ¶¶ 6-7.

For example, between April and June, UC Riverside's ("UCR's") Instructional Continuity Working Group, comprising faculty, staff, and students, evaluated options for providing a healthy and effective teaching environment for the 2020-21 academic year. Deas Decl. ¶ 4. UCR's response to the COVID-19 pandemic is coordinated among ten faculty-led working groups, including public health, research ramp-up, budget and finance, student services continuity, student health assistance, instructional continuity, operations & support recovery, testing, employee health assistance, and instructional technology. *Id.* ¶ 6. UCLA's Emergency Management Planning Group (EMPG) began working on UCLA's COVID-19 response at the end of February 2020.  UCLA's efforts include its "Back to School" campus-wide working group, and regular consultation between UCLA Health's infectious control experts, officials from other UC

CROWELL
& MORING LLP
ATTORNEYS AT LAW

7

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1   campuses, and officials with the LA County Department of Public Health. *See, e.g.*, Wakimoto

2   Decl. ¶¶ 4-5, 8.

3        At the system-wide level, beginning in March 2020, the Council of the Vice Chancellors

4   of Research ("COVCR"), began holding weekly meetings to provide guidance regarding the

5   impact of the pandemic on university research. Wakimoto Decl. ¶ 4. The University has also

6   created a systemwide Testing and Tracing Task Force (the "Task Force"), which includes subject

7   matter experts, administrators, and faculty, and staff from across the University system. Christ

8   Decl. ¶ 7. The Task Force has emphasized that, for all UC campuses "[t]he cornerstone of

9   mitigation will be decreasing normal campus population density, in order to decrease interactions

10  that may result in person-to-person transmission of the virus." *Id.*; *see also id.* at Ex. B.

11       Following months of study and consultation with epidemiologists, medical experts, and

12  industry experts, all ten campuses created plans for their Summer and Fall 2020 curricula based

13  on the status of COVID-19 in their specific geographic locations. *E.g.*, *id.* ¶ 5 (UC Berkeley);

14  Deas Decl. ¶¶ 15, 20 (UC Riverside); Schooley Decl. ¶¶ 13-16 (UC San Diego). The campuses

15  have dramatically transformed their approach to instruction for Fall 2020: UC Berkeley intends to

16  conduct limited in-person classes;[10] UC Davis plans to offer most courses remotely; Irvine

17  courses will be remote with minimal exceptions; UCLA is currently all-remote, but anticipates

18  15% to 20% of courses will be in-person or in a hybrid format for the 2020-21 academic year; and

19  UC San Diego hopes for 30% in person classes, with 70% remote or hybrid. Schooley Decl. ¶ 16.

20  Thus, classes will be remote in Fall 2020 for most courses and students. These plans are subject to

21

22  [10] For example, UC Berkeley's response to the COVID-19 pandemic has been coordinated by *nine*
    committees. Christ Decl. ¶ 4. One such committee, the Public Health and Testing Advisory

23  Committee, is chaired by Dr. Nicholas P. Jewell, Emeritus Professor of Biostatistics in the UC
    Berkeley School of Public Health and includes infectious disease experts, public health

24  epidemiologists, physicians, scientists with expertise in diagnostic testing, statisticians and data
    scientists. *Id.* Between May and June 2020, this committee evaluated all options for providing a

25  healthy and effective learning environment for the 2020-21 academic year, assessing all options
    from full remote instruction to return to mostly in-person instruction. *Id.* ¶ 8. On June 17, 2020,

26  the committee issued its report recommending that "[t]o the extent that any classes occur in
    person" in the Fall 2020 semester, such classes should be limited to "26 [individuals] or under

27  (including instructors)." The report also explained that "remote access will likely be required for
    most if not all classes because at-risk participants may not be able to attend in person." *Id.* at ¶ 9.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905705894.8

1   change, based on new information that infections are now surging in California and elsewhere.

2   *E.g.*, Schooley Decl. ¶ 16; Wakimoto Decl. ¶ 9.

3   On May 22, 2020, recognizing the need to dramatically transform on-site operations, The

4   Regents released the "University of California Consensus Standards for Operation of Campus and

5   ANR Locations in Light of the SARS-CoV-2 Pandemic."  Christ Decl. ¶ 6, Ex. A. In light of

6   these recommendations and in reliance on the March 13 Guidance, UC Berkeley's Chancellor

7   announced that the Fall 2020 semester would be online with only limited in-person instruction. *Id.*

8   ¶ 11. Other campuses made similar announcements. *E.g.* Deas Decl. ¶ 15; Schooley Decl. ¶ 13;

9   Wakimoto Decl. ¶ 9. Even those courses with limited in-person instruction will also allow for

10  remote attendance. Christ Decl. ¶ 6; Deas Decl. ¶ 15. To implement these recommendations, the

11  campuses expended further time and resources developing a class schedule that accounted for the

12  number and nature of courses and whether they would be held entirely online or in person. *E.g.*,

13  Christ Decl. ¶ 12; Schooley Decl. ¶¶ 13-14; Deas Decl. ¶¶ 15, 20.

14  These precautions have been put in place with additional specific consideration for the

15  University faculty and others with pre-existing health conditions. Christ Decl. ¶ 17. For example,

16  the average UC Berkeley faculty member is 52 years old, with many faculty members over the

17  age of 65. Christ Decl. ¶ 17(d). According to the CDC, while every human is at risk from

18  COVID-19, older adults are at the highest risk for severe illness or death.

19  UC Berkeley, like all other UC campuses, has spent months preparing for the Fall

20  semester. *See, e.g.*, Christ Decl. ¶ 16; Deas Decl. ¶ 20; Schooley Decl. ¶ 15. For example, at UC

21  Berkeley, Fall semester enrollment begins on July 8, 2020, and UC Berkeley students report back

22  to campus in a few weeks for classes beginning on August 26, 2020. Christ Decl. ¶ 16. Other UC

23  campuses offer undergraduate classes starting in September. It would be extremely difficult at this

24  point for any of the campuses to develop a revised educational plan that would enable all

25  international students to maintain their visas under the Directive. In addition to the University's

26  determinations regarding the risk of reopening or adding more in-person instruction, it is an unfair

27  and unnecessary drain on public resources to require the University to upset months of planning

28  for the Fall semester within a matter of mere weeks.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

9

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

**D.     The Loss of International Students Enrolled Across Campuses Will have Substantial Adverse Effects Throughout the University System.**

The loss of international students enrolled at the University will have substantial adverse effects. Nearly 30% of UC Berkeley's graduate programs and 50% of its graduate engineering program students are international students potentially affected by the Directive. *Id.* ¶ 17; *see also* Deas Decl. ¶ 21(b). These graduate students, in addition to performing critical research roles, have obligations as teaching assistants. *Id.* The loss of these students would have significantly detrimental effects on UC Berkeley's ability to carry out its instruction of undergraduates.[11] *Id.* The University's research mission also depends on numerous international partnerships and collaborations, which in turn depend on the recruitment and enrollment of the best and brightest students from across the world, particularly in the science, technology, engineering, and mathematics ("STEM") disciplines. Christ Decl. ¶-18; *see also* Schooley Decl. ¶ 20(b). Even a semester-long disruption in the University's ability to conduct significant STEM research would have detrimental effects on it as an international research university.[12] *Id.* Further, the loss of diversity at the University should international students be forced to withdraw will have a negative pedagogical impact on all students, who will be deprived of the diversity of perspectives and experience that enrich the learning environment. Christ Decl.¶ 17; *see also* Deas Dec. ¶ 21(d); Schooley Decl. ¶¶ 20(d), 21(g).

As a result, the Directive forces University campuses to choose between losing numerous

---

[11] Tuition paid by international students is significant to UC's finances. *Id.* ¶ 17. International undergraduate students in the University of California system accounted for approximately $1.1 billion in tuition and fee receipts in the 2019-2020 school year.. Alcocer Decl. ¶ 5. Tuition and fees attributable to international graduate students account for an additional $350 million. *Id.* ¶ 6. This financial shortfall cannot easily be recouped through enrollment of other students, particularly due to the difference in tuition between in-state and out-of-state students. *Id.* ¶ 9. These negative financial impacts also affect UC's ability to support financial aid and to undertake infrastructure improvements across campuses. *Id.*

[12] Representative research at UC Berkeley that relies in significant part on the enrollment of international students includes, *inter alia*, a project for the U.S. Army in which UC Berkeley students are conducting cutting-edge research related to drone technology and a research program developing projection algorithms to predict COVID-19 cases, hospitalizations, ICU admissions, and ventilator needs at the county and hospital level throughout the United States. In each case, the loss of international students with discrete and unique skillsets would create extensive delays unacceptable to UC's partners and to society writ large. *Id.* ¶ 18.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

10

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1    international students who bring immense benefits or taking steps to provide in-person instruction

2    against the sound judgment of University and public health experts about how best to protect the

3    health of the University's students, faculty, and staff. *Id.* ¶ 21. Each University campus would be

4    forced to increase the number of in-person classes available, thereby increasing the risk of

5    exposure to the COVID-19 virus to other members of the community, including the faculty

6    required to lead those in-person classes as well as the staff needed to support those in-person

7    activities. *See, e.g., id.* Further, to comply with the Directive, the University will be required to

8    reissue thousands of Form I-20 documents for the F-1 visa holders across each of its campuses.

9    *Id.* at ¶ 17. At UC Berkeley alone, this will require hundreds of staff hours to complete. *Id.*

10        **E.    Students' Reliance on ICE's March 13 Guidance**

11        As a result of the University's response to the COVID-19 pandemic, which relied in part

12    on the March 13 Guidance, all University students in effect have relied on the March 13 Guidance

13    in planning to attend the University this Fall. International and U.S.-based students alike have

14    taken out loans and made housing arrangements or moved home for the Fall semester anticipating

15    that their studies would resume through remote instruction. Many international students have

16    returned to their home countries in reliance on the government's instruction that their studies

17    could resume online. Many of those students are now unable to return to the United States

18    because of travel restrictions, the government's refusal to re-issue visas and, now, the

19    government's insistence that universities certify that their instruction will proceed in person. *See,*

20    *e.g., id.* ¶ 19. Other students who have remained in the United States will be forced to leave under

21    the Directive and will be forced to break leases and pay resulting penalties. *Id.* ¶ 19.

22        Practically, it is too late for any student to transfer to another university, mere weeks

23    before the start of the Fall semester, especially international students who must find a university

24    in this country that can certify its intent to offer a mostly in-person curriculum despite the

25    significant health risks involved in doing so.  Even if students wanted to transfer, it is also

26    unlikely that there would be sufficient alternative in-person programs in the country for all

27    international students given the substantial liability to universities and the risk to student, faculty,

28    and staff.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

11

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

Moreover, international students face emotional and psychological trauma from the sudden and unanticipated disruption to their ability to pursue their education in the United States, the inability to participate in U.S.-based practical training opportunities (e.g. internships) which will further negatively impact their professional prospects, violence and poverty afflicting their home countries, and being forced to return to home country living situations without reliable, high-speed internet access necessary for remote instruction. *E.g. id.* ¶ 19; Schooley Decl. ¶ 21.

## F.     ICE's Sudden and Arbitrary Rescission of the March 13 Guidance

Despite the President's continuing national emergency declaration and the March 13 Guidance's express statement that its exemption from the in-person class requirement would remain "in effect for the duration of the [COVID-19] emergency," on July 6, 2020, ICE suddenly and arbitrarily reversed its course, stating:

1) recipients of F-1 visas are no longer permitted to "take a full online course load and remain in the United States";

2) "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences" such as the initiation of removal proceedings;

3) no new F-1 visas would issue to students planning to enroll in programs that will be fully online for the fall semester;

4) "students attending schools offering a hybrid model – that is, a mixture of online and in person classes – will be allowed to take more than one class or three credit hours online," provided that for each such student, the school certifies by August 4, 2020, "within 21 business days of publication" of the Directive, "that the school is not operating entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."

The Directive also re-characterizes ICE's March 13 Guidance, stating that the earlier guidance "instituted a temporary exemption regarding the online study policy for the *spring and summer* semesters." (emphasis added). Nothing in the March 13 Guidance, however, suggests any such temporal limit. To the contrary, the March 13 Guidance explicitly stated it would remain "in effect for the duration of the emergency." Nowhere in the Directive or accompanying News Release does ICE provide any justification for the reversal of policy, nor is there any indication

CROWELL
& MORING LLP
ATTORNEYS AT LAW

12

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1   that the government undertook any consideration or analysis of relevant factors such as the impact

2   of the reversal on the health and safety of university students, faculty, and staff, the effect on

3   public health for the communities surrounding every academic institution affected by the policy

4   change, or the justifiable reliance on the March 13 Guidance by universities and students in

5   planning for the Fall 2020 term. The Directive also contains no acknowledgement of the

6   ongoing—indeed, rapidly-worsening—COVID-19 pandemic.

7   **III.   LEGAL STANDARD**

8           The standard for issuing a temporary restraining order is "substantially identical" to the

9   standard for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush &*

10  *Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A temporary restraining order may properly issue

11  where the plaintiff establishes that (1) it is "likely to succeed on the merits," (2) it is "likely to

12  suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" tips in

13  its favor, and (4) an "injunction is in the public interest." *Alliance for the Wild Rockies v.*

14  *Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S.

15  7, 20 (2008)). In certain cases, "serious questions going to the merits" and a hardship balance that

16  tips sharply toward the plaintiff can support the issuance of a temporary restraining order,

17  assuming the other two *Winter* elements are met. *Alliance for the Wild Rockies*, 632 F.3d at 1132.

18  Serious questions "need not promise a certainty of success, nor even present a probability of

19  success, but must involve a fair chance of success on the merits." *Republic of the Philippines v.*

20  *Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (internal citations omitted). Under the Ninth

21  Circuit's "sliding scale" approach, "the elements of the preliminary injunction test are balanced,

22  so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v.*

23  *Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (internal citations omitted).

24  **IV.   ARGUMENT**

25          This case arises under the Administrative Procedure Act, which requires that the Court set

26  aside agency action that is, *inter alia*, arbitrary and capricious, otherwise unlawful, or taken

27  without observing procedure required by law. *See* 5 U.S.C. § 706(2)(A), (D). ICE's July 6

28  Directive fails under the APA standard in at least two general respects: it is both (i) arbitrary and

CROWELL
& MORING LLP
ATTORNEYS AT LAW

13

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1    capricious for lack of any reasoned explanation and for failure to consider factors plainly relevant

2    to such a significant reversal of policy, and (ii) defective because ICE failed to provide the public

3    advance notice of its proposed action or any opportunity to comment on it before finalization.

4           The July 6 Directive is arbitrary, capricious, or otherwise unlawful for at least three more

5    specific reasons. *First*, ICE failed to offer a reasoned explanation for its sudden reversal of the

6    March 13 Guidance—which ICE had stated expressly would extend "for the duration of the

7    emergency." When the government reverses its own earlier policy, it must "acknowledge and

8    provide an adequate explanation for its departure from established precedent, and an agency that

9    neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the

10   Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citations omitted); *see also Encino

11   Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency departure from prior policy

12   impermissible without "explaining its changed position"); *Dep't of Homeland Security v. Regents

13   of the Univ. of Cal.,* No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) ("Regents"), at *14-15

14   (slip op.) at 23-24.

15          *Secon*d, ICE failed to consider important aspects of the problem, including: (1) the health

16   risks associated with its new policy; the burden on universities of having to certify thousands of

17   F-1 visa-holding students as complying with the Directive's strictures regarding in-person

18   instruction, all by August 4, when most students will not yet committed to their classes; (2) the

19   impact of the reversal on the finances of, and other costs that must be borne by universities, due to

20   the loss of tuition from F-1 students who disenroll or from having now to provide safe in-person

21   instruction and certify that each student engaged in a hybrid program meets the Directive's

22   requirements; and (3) the many reliance interests, both of the University and its F-1 students, that

23   ICE's now abandoned March 13 Guidance engendered. An agency must grapple with such issues

24   when it issues a substantive rule affecting the rights or obligations of individuals or entities.[13] *See*

25

26   ─────────────────────
     [13] ICE concedes its July 6 Directive is intended to operate as a final rule. The Guidance itself
27   states that the "U.S. Department of Homeland Security plans to publish the procedures and
     responsibilities in the below Broadcast Message [the July 6 Directive] in the near future *as a
28   Temporary Final Rule in the Federal Register*." (Emphasis added).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905705894.8

14

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

1    *Encino Motorcars,* 136 S. Ct. at 2124-2126.

2          *Third*, ICE failed to articulate any rational connection between the facts it found and the

3    choice it made. *See Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687

4    n.15 (9th Cir. 2007); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010).

5          Further, the July 6 Directive is fatally flawed, because it is a substantive rule affecting the

6    rights and obligations of the University and its students, and the promulgation of which required

7    ICE to first give notice to the public of its intent to adopt the rule, and provide any interested

8    person with an opportunity to comment before the Directive was finalized. 5 U.S.C. § 553(b). It

9    did not do that and, therefore, the July 6 Directive is unlawful for failure to follow the rulemaking

10   procedure required by the APA.

11         On both counts, Plaintiff is likely to succeed on the merits. The other preliminary

12   injunction requirements are likewise readily satisfied. As the supporting declarations make

13   abundantly clear, the University of California system stands to suffer substantial and irreparable

14   harm absent a temporary restraining order preserving the status quo. The balance of the equities

15   also weighs heavily in favor of a TRO: Plaintiff and its students will be injured immediately and

16   irreparably under the July 6 Directive, while the United States stands to lose nothing if the

17   Directive is enjoined. After all, a TRO would merely maintain the status quo the government

18   itself instituted, responsibly, in its March 13 Guidance, which it stated at the time would remain in

19   place for the duration of the emergency. The emergency is not over. Finally, a TRO is in the

20   public interest. The value to the public of colleges and universities of having vibrant and diverse

21   student bodies, including international students, is obvious—that value manifests not merely in

22   the form of the cultural experiences of individual students or the student body and campus life

23   generally, but in the economies of the host communities. If the international students leave, that

24   value to the public is lost. And if, alternatively—in an effort to salvage their international student

25   bodies—schools try to accommodate the July 6 Directive by reverting to in-person instruction

26   while the pandemic is still raging and thus risking increased transmission and community spread,

27   the public is harmed in all the ways public health officials have been warning about.

28   ///

CROWELL
& MORING LLP
ATTORNEYS AT LAW

15

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

**A.    THE REGENTS ARE LIKELY TO SUCCEED ON THE MERITS.**

**1.    The Regents Are Likely to Prevail on the First Cause of Action Under the APA Because the July 6 Directive is Arbitrary and Capricious.**

The Administrative Procedure Act "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). In evaluating whether agency actions are reasonable and lawful, courts must conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). A court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Butte Envt'l. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010). Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned explanation" for departures from preexisting policies. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted); *Encino Motorcars*, 136 S. Ct. at 2126 (in explaining its changed position, an agency must also be cognizant that prior policies may have "engendered serious reliance interests that must be taken into account"); *see also Regents*, 2020 WL 3271746, at *14. The Directive fails each of these requirements.

**a.    The Directive Failed to Offer a Reasonable Explanation for ICE's Policy Reversal.**

As an initial matter, the Directive turns a blind eye to the reliance colleges and universities and their international students placed on the March 13 Guidance in planning for the Fall 2020 semester. Having stated in that earlier Guidance that the policy would remain in effect "for the duration of the emergency," it was nothing short of shocking that ICE would announce in the Directive that F-1 students would not be allowed into the country or, if already here, would be required to leave the country, if their schools are not intending to provide traditional classroom

CROWELL
& MORING LLP
ATTORNEYS AT LAW

16

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1  instruction, and that universities would have to certify by August 4 that the courses selected by

2  thousands of international students in hybrid programs meet the Directive's in-person classroom

3  strictures. The July 6 Directive never acknowledges what the March 13 Guidance actually said:

4  that it would remain in place for the duration of the emergency. The Directive instead states that

5  ICE had only provided guidance for the "spring and summer semesters." That is not correct.

6      Even where authorized to do so, when a federal agency reverses its own prior policy, it

7  must "acknowledge and provide an adequate explanation for its departure from established

8  precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla*, 613

9  F.3d at 1119 (D.C. Cir. 2010) (internal citation omitted); *see also Encino Motorcars*, 136 S. Ct. at

10  2126 (agency cannot depart from prior policy without "explaining its changed position");

11  *Regents*, 2020 WL 3271746, at *14-15 (finding that DHS's decision to rescind DACA was

12  arbitrary and capricious, in part because DHS's memorandum rescinding the DACA policy failed

13  to consider certain aspects of policy). Thus, reversing a pre-existing policy requires a "more

14  detailed justification than what would suffice for a new policy created on a blank slate." *FCC v.*

15  *Fox Telev'n Stns., Inc.*, 556 U.S. 502, 515 (2009).

16      Here, as discussed, the Directive represents a complete reversal of Defendants' earlier

17  Guidance on not only the existence and severity of the COVID-19 pandemic but, more

18  importantly, the ability of students studying on F-1 visas "to continue to make progress in a

19  normal course of study." *See* March 9 Guidance at 1. The failure to provide any justification for

20  the reversal is contrary to law and requires that the Directive be set aside.

21          **b.    The Directive Failed to Consider Important Aspects of the**
                    **Problem, Including the Reliance of Plaintiff and Its Students on**
22                  **the March 13 Guidance.**

23      Further, the Directive fails to consider, much less evaluate, the significant reliance

24  interests of both the University and its affected students engendered by the current DHS/ICE

25  policy. *Regents*, 2020 WL 3271746 at *4; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106

26  (2015) (government must provide special justification "when its prior policy has engendered

27  serious reliance interests that must be taken into account"). The Directive also fails to consider the

28  health risks that a broader re-opening of in-person classes would entail; the burdens on the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

17

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1  universities (and the likely impossibility) of having to certify, by August 4, that the courses

2  chosen by each F-1 visa holder in a hybrid program comply with the in-person classroom

3  strictures of the Directive; and the financial and other impacts the Directive would have on

4  universities and their educational programs, as well as on students, faculty and staff.

5      The March 13 Guidance expressly permitted F-1 students to "participate in online or other

6  alternate learning procedures" and assured universities and students that the policy would be "in

7  effect for the duration of the emergency." *See* March 13 Guidance; *see also id*. at 1-2 (applying

8  same policy to international students who return to their home countries and continue to take

9  classes on-line). To change this policy with no notice and without considering any of these

10  effects, is an arbitrary, capricious, and unreasoned agency action. It must be set aside.

11      Based in part on the March 13 Guidance, the University started preparing and planning for

12  the Fall 2020 semester four months ago. *See* Christ Decl. ¶ 3. Specifically, at each campus, the

13  University engaged its faculty in the assessment and development of COVID-19 recovery and

14  resiliency planning to ensure the safety of its university community while continuing to carry out

15  its education and research mission. *See generally id.*, ¶¶ 4-17. The University invested millions of

16  dollars and thousands of faculty hours tackling important considerations impacting health and

17  safety. Alcocer Decl., ¶ 10. At UC Berkeley alone, nine committees of experts across numerous

18  disciplines have worked for months to determine the University's best course forward in the Fall.

19  Christ Decl., ¶ 4. Relying on the fact that international students would continue their studies

20  online, the University administration and various working groups devised a complex course

21  schedule that accounted for the large number of courses and the nature of individual courses and

22  the feasibility of transitioning those courses to online instruction. *Id.* ¶ 12. The University's Fall

23  semester curriculum assumed that international students would continue to be enrolled at the

24  University even if their classes would be held primarily online. *Id.* at ¶¶ 11-16. Also relying on

25  the March 13 Guidance, the University's Fall curriculum assumed that international graduate

26  students would continue in their roles as teaching assistants. Similarly, the University's budget for

27  the Fall semester assumed the continued enrollment of international students. Alcocer Decl., ¶¶ 5-

28  6. The disenrollment of international students from the University in the Fall semester alone

CROWELL
& MORING LLP
ATTORNEYS AT LAW

18

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1  resulting from the enforcement of the Directive could be substantial, and likely cannot be made

2  up by extending offers at this late date to U.S.-based students. *Id*.

3        UC's students who hold F-1 visas relied on the March 13 Guidance as well. *See* Christ

4  Decl. ¶19. Many international students continued to live near their campuses in reliance on the

5  fact that they could continue their instruction, albeit online, through the Fall semester. *Id*. If the

6  Directive is enforced, those students who remained in the U.S. during the Summer would be

7  forced to break their leases at great expense. *Id*. Those students who have already left the country

8  planning to return for the Fall semester, have not made plans to transfer to other universities – and

9  are to suffer significant interruption in their education with negative impacts to their career

10 prospects. Other international students will be unable to participate in U.S.-based practical

11 training opportunities like internships that will further impact their development of practical skills

12 and professional networks.

13        Had these international students known that Defendants would abruptly issue its

14 Directive, thereby reversing the March 13 Guidance, these students could have made other

15 arrangements for Fall 2020. Now, it is too late to expect students to transfer to other universities,

16 especially for those students in specialized courses of study, as the Directive suggests that

17 students may do. Moreover, similarly-situated universities dealing with the devastating effects of

18 COVID-19—indeed, all of them—would also be forced to primarily offer online instruction. The

19 government's facile instruction that international students simply enroll in a different university

20 offering in-person instruction is particularly cruel under the circumstances.

21        Beyond reliance interests, the Directive is oblivious to other important aspects of the

22 problem. Among other things, Defendants failed to consider the social, academic, and research

23 impacts of their decision. Many students have already reported the emotional and psychological

24 harm from the sudden, unanticipated about-face in the government's immigration policy. Others

25 have expressed concern about being forced to return to the violence and poverty afflicting their

26 home countries or being forced to return to their home countries where there may not be adequate

27 access to reliable high-speed internet required for remote learning technologies.

28        The Directive also fails to account for the various benefits and contributions made by

CROWELL
& MORING LLP
ATTORNEYS AT LAW

19

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

international students to institutions of higher learning. *All* students benefit from a diversity of perspectives and experiences. Depriving universities of a key element of their diverse student bodies does real damage to the institution of learning and to all students' educational experience. Moreover, international students play critical roles in the University's research partnerships as discussed above. The threat to the University's research objectives caused by the removal of international students merely because their coursework will take place online in the midst of a global pandemic is substantial. In some cases, the setback in research due to the loss of the unique skillsets of many international students is months, if not years. *See* Christ Decl. ¶ 18; Deas Decl. ¶¶ 21(a), 23; Schooley Decl. ¶ 20(a). Further, Defendants have not acknowledged, much less analyzed or considered, the extreme setback to public health that their July 6 Directive represents. As a result of the significant losses threatened by the disenrollment of thousands of international students, the July 6 Directive will likely force universities to prematurely revert to in-person instruction, upending any gains made by communities in quelling the rapid spread of COVID-19 and squandering the past sacrifice of millions across this country. Many of these harms are explained further below, in the discussion of irreparable harm, and detailed more completely in the attached declarations. But in addition to the Court's evaluation of the gravity of the harms for purposes of that separate prong of the TRO test, it must consider ICE's lack of attention to these harms in evaluating the reasonableness of the agency's action. Here, the July 6 Directive lacks the *sine qua non* of lawful agency action: reasoned decision-making. *See Regents,* 2020 WL 3271746, at *15.

### c.     Defendants Failed to Explain Any Basis for the Directive.

The Directive is arbitrary and capricious also because it does not articulate *any* rationale that would justify ICE's decision. It is "a fundamental requirement of administrative law … that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (internal citation omitted). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id.* (internal marks omitted); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (an agency must "articulate[] a satisfactory explanation for [its] decision").

CROWELL & MORING LLP
ATTORNEYS AT LAW

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

The two and one-half page Directive fails this threshold test. It threatens to inflict grievous harm on hundreds of thousands of F-1 visa-holding university students who were invited to study at American universities, including the potential for removal proceedings to make them leave, without providing *any* explanation—much less a clear and adequate explanation—as to why.

The sole statement that might be considered a "justification" is the statement that while "accommodations to provide flexibility to schools and nonimmigrant students" may be made, such accommodation must be weighed against "a concordant need to resume the carefully balanced protections implemented by federal regulations." Compl., Ex. A at 1. Such threadbare and cryptic justification is woefully deficient, if for no other reason than the fact that it cannot possibly be based on "the relevant data," such as the well-documented fact that the COVID-19 health crisis is currently intensifying, not abating. *See Dep't of Commerce v. New York*, 139 S. Ct. at 2569. This is demonstrable from the simple fact that the rate of infections and hospitalizations is greater today than it was when the March 13 Guidance issued. Moreover, the government itself is predicting that as many as 1.5 million people may ultimately die from COVID-19 illness, with nearly 210,000 of those deaths occurring by November 1. Thus, to the extent that this statement can be read as the federal government's justification for its abrupt about-face from its March 13 Guidance, it is inadequate as insufficiently based on fact and reason.

Moreover, DHS has admitted publicly that the *actual* basis for the reversal of the policy rests on political considerations rather than rational decision-making after reasoned deliberation and consultation with experts. Acting Deputy Secretary of Homeland Security Kenneth Cuccinelli set pretext aside when he plainly announced, on July 7, 2020, that the F-1 visa policy change is designed to "encourage schools to reopen."[14]

In light of Defendants' failure to provide any comprehensible rationale for its about-face, the Directive rescinding the March 13 Guidance should be set aside. *SEC v. Chenery Corp.*

---

[14] John Bowden, *Cuccinelli says rule forcing international students to return home will 'encourage schools to reopen'* (July 7, 2020, 4:17 PM), https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home

CROWELL
& MORING LLP
ATTORNEYS AT LAW

21

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1   ("*Chenery II*"), 332 U.S. 194, 196–97 (a court cannot "be compelled to guess at the theory

2   underlying the agency's action; nor can a court be expected to chisel that which must be precise

3   from what the agency has left vague and indecisive."); *Nat'l Ass'n of Home Builders v. Norton*,

4   340 F.3d 835, 849 (9th Cir. 2003) (same).

> **2.   The Regents Will Likely Prevail on Its Second APA Cause of Action, Because the Directive is a Substantive Rule that Did Not Comply with the APA's Notice and Comment Requirements**

7   The Regents are also likely to succeed on its claim that the Directive purporting to rescind

8   the March 13 Guidance also fails to meet the APA's procedural requirements. The Directive is a

9   legislative rule compelling universities to take certain action, not previously required, under pain

10  of being deemed out of compliance. Indeed, ICE states in the Directive itself that it intends to

11  publish its content at some future time in the Federal Register as a Temporary Final Rule.

12  Because the Directive is a legislative rule, DHS was required to abide by the full panoply of APA

13  procedures, including providing notice and an opportunity for public comment. It failed to do so.

14  Under the APA, courts must set aside agency action that is taken without observance of

15  procedures required by law. 5 U.S.C. § 706(2)(D). An agency's substantive rules must go through

16  the APA's notice and comment rulemaking requirements before they become effective. *See* 5

17  U.S.C. § 553(b), (c); *San Diego Air Sports Ctr., Inc. v. F.A.A.*, 887 F.2d 966, 971 (9th Cir. 1989).

18  A rule is substantive if it "narrowly limits administrative discretion" or establishes a "binding

19  norm" that "so fills out the statutory scheme that upon application one need only determine

20  whether a given case is within the rule's criterion." *Colwell v. Dep't of Health & Human Servs.*,

21  558 F.3d 1112, 1124 (9th Cir. 2009). Put another way, an agency's substantive rule that has the

22  "force and effect of law" is subject to the APA's notice and comment procedures. *Chrysler Corp.*

23  *v. Brown*, 441 U.S. 281, 302-303 (1979); *accord Ciox Health, LLC v. Azar,* 435 F. Supp. 3d 30,

24  66 (D.D.C. 2020) (explaining that "a rule is legislative, and therefore must undergo notice and

25  comment, when it 'change[s] the law,'" and concluding that HHS's amended rule and guidance

26  regarding fees for delivering health records was a legislative rule subject to notice and comment)

27  (*quoting Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011)).

28  Here, the Directive is a substantive rule for which the APA's notice and comment

CROWELL
& MORING LLP
ATTORNEYS AT LAW

22

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1   requirements applied. Among other things, because the University is adopting a hybrid model –

2   that is, a mixture of on-line and in-person classes –for the Fall 2020 semester, the Directive

3   compels the University to certify to SEVP for each of its 37,000-plus F-1 students that, among

4   other things, "the student is not taking an entirely on line course load" by August 4, 2020. Christ

5   Decl. ¶ 17(f). This is a significant burden on the University as it will require thousands of hours of

6   staff time, further exacerbated by the fact that only designated school officials certified by DHS

7   may perform these tasks, thereby significantly limiting the University's ability to adapt to this

8   substantial added burden. *Id.*. The Directive also compels F-1 visa students to take courses in-

9   person to be able to remain in the United States to continue pursuing their studies or face the

10   threat of visa revocation or even removal. ICE/SVEP is also conditioning the UC students'

11   maintenance of their F-1 nonimmigrant status upon compliance with the Directive. The Directive

12   is indisputably a substantive rule, subject to notice and comment requirements.

13   **B.      THE REGENTS AND ITS STUDENTS ARE LIKELY TO SUFFER**
            **IRREPARABLE HARM.**
14

15           The Directive is already inflicting severe and irreparable harm on the University. UC is

16   being forced right now to grapple with decisions with life-altering consequences for its

17   international students as well as serious impacts to the health and safety of everyone affiliated

18   with the University and the communities that it serves. The Directive presents the University with

19   a Hobson's choice: reopen more of its lecture halls, dormitories, and dining halls at great risk to

20   the health of all of its students, faculty, and staff, *or* effectively prevent UC students who hold F-1

21   visas the opportunity to carry out their studies and, thus, deprive all other UC students of the

22   diversity of opinion and perspective that they expect and is central to the pedagogy of a world-

23   class academic institution. UC's impossible decision threatens irreparable consequences for its

24   academic community, including the immediate loss of valued students and the erosion of any

25   gains made to date in protecting its community from an even higher rate of transmission of the

26   potentially deadly COVID-19 virus. That the Directive theoretically permits UC students with F-1

27   visas to transfer to another university does not materialize into realistic options for UC students at

28   this time. In this situation, "[a] delay, even if only a few months, pending trial represents precious,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

23

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

productive time irretrievably lost." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011) (internal citation omitted). Moreover, it is no solution to permit international students to take a "hybrid" course load where then any international student with a pre-existing medical condition that makes him or her susceptible to severe illness resulting from COVID-19 would be unfairly discriminated against for opting not to attend in person classes.

The Directive further creates economic harm to the University. *See* Alcocer Decl. ¶¶ 5-6. Moreover, the budget shortfall will also prevent the University from carrying out planned infrastructure and capital improvements to its campus facilities. *Id*. ¶ 9. Even before the Directive, the University was reeling from the economic fall-out of the COVID-19 pandemic and the resultant transition to on-line learning. Indeed, the University spent millions developing its COVID-19 recovery and resiliency plans, which investment would be rendered meaningless if the University were forced to abandon its well-considered plan to protect the health of its community. *Id*. ¶ 10. Furthermore, the University estimates that it will have to expend significant resources to reissue I-20 forms for the thousands of students affected by the Directive. *See* Christ Decl., ¶ 17.

More importantly, if the Directive is implemented, the University will suffer the loss of many international students that are vital to the pedagogy of its lecturers, the vibrancy of its culture, and the success of its research programs. The University and surrounding community will further lose the substantial economic benefit from international students. Christ Decl. ¶ 19(d).

### C.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF A TEMPORARY RESTRAINING ORDER.

The final elements of the preliminary injunction test—the balance of the equities and the public interest—merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *See id.* at 766.

The balance of the equities and the public interest weigh overwhelmingly in favor of granting a temporary restraining order to the Regents to maintain the status quo, in advance of the August 4 deadline to submit Form I-20 certifications to ICE. Compl., Ex. A at 2. While UC and its students holding F-1 visas will be severely impacted should the Directive be implemented, the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

24

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

1    Defendants face no articulable harm should the Court grant a temporary restraining order. Since

2    Defendants intended for the March 13 Guidance to remain "in effect for the duration of the

3    emergency," they cannot now claim that they will be harmed by the continuation of their sound,

4    prior policy. As discussed in detail above, the public health emergency caused by the COVID-19

5    pandemic is ongoing, and there is no reasonable basis to contend otherwise. Further, the reversal

6    in policy appears to stem from a desire to reopen schools regardless of whether doing so will

7    harm the health and lives of university students, faculty, and staff and place other with whom

8    university community members come into contact at risk. The balance of equities between UC's

9    goal of protecting the health and well-being of its community and maintaining its academic

10   freedom on the one hand, and a federal government seeking to recklessly force in person activity

11   at universities on the other, tips sharply in favor of granting the temporary restraining order. It is

12   abundantly in the public interest that Defendants be enjoined from carrying out their arbitrary and

13   capricious plan to force the premature transition of universities to in-person learning.

14           Finally, a temporary restraining order is appropriate where, as here, the hardship balance

15   tips sharply toward the plaintiff, and the plaintiff has articulated "serious questions going to the

16   merits." *Alliance for the Wild Rockies*, 632 F.3d at 1132. The Regents have demonstrated "a fair

17   chance of success on the merits" on their claims and irreparable harm if the Directive is permitted

18   to proceed. Further, the balance of equities and the public interest favors the Regents.

19   **V.    CONCLUSION**

20           For all the above reasons, this Court should issue a TRO which (i) enjoins Defendants

21   from proceeding with their July 6 Directive and (ii) orders that Defendants preserve the status quo

22   ante pending adjudication of this dispute on the merits.

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

25

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8

| | |
|---|---|
| 1 | Dated: July 10, 2020 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

Dated: July 10, 2020

Respectfully submitted,

CROWELL & MORING LLP

By: */s/ Jennifer S. Romano*

Jennifer S. Romano (SBN 195953)
jromano@crowell.com
Emily T. Kuwahara (SBN 252411)
ekuwahara@crowell.com
Crowell & Moring LLP
515 South Flower Street, 40th Floor
Los Angeles, California 90071
Telephone:  213.622.4750

Charles F. Robinson (SBN 113197)
charles.robinson@ucop.edu
Margaret L. Wu (SBN 184167)
margaret.wu@ucop.edu
Allison M. Woodall (SBN 178533)
Allison.woodall@ucop.edu
Sonya U. Sanchez (SBN 247541)
sonya.sanchez@ucop.edu
UNIVERSITY OF CALIFORNIA
OFFICE OF THE GENERAL COUNSEL
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone:  510.987.9800

Thomas A. Lorenzen (*pro hac vice* forthcoming)
tlorenzen@crowell.com
Daniel W. Wolff (*pro hac vice* forthcoming)
dwolff@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
Telephone:  202.624.2500

*Attorneys for Plaintiff*
*THE REGENTS OF THE UNIVERSITY OF*
*CALIFORNIA*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

26

PLAINTIFF'S MOTION FOR TEMPORARY
RESTRAINING ORDER
CASE NO. 3:20-CV-04621

SFACTIVE-905705894.8