1   Jennifer S. Romano (SBN 195953)
    jromano@crowell.com
2   Emily T. Kuwahara (SBN 252411)
    ekuwahara@crowell.com
3   CROWELL & MORING LLP
    515 South Flower Street, 40th Floor
4   Los Angeles, California 90071
    Telephone: 213.622.4750
5
    A. Marisa Chun (SBN 160351)
6   mchun@crowell.com
    Molly A. Jones (SBN 301419)
7   mojones@crowell.com
    CROWELL & MORING LLP
8   3 Embarcadero Center, 26th Floor
    San Francisco, California 94111
9   Telephone: 415.986.2800

10  Thomas A. Lorenzen (*pro hac vice* forthcoming)
    tlorenzen@crowell.com
11  Daniel W. Wolff (*pro hac vice* forthcoming)
    dwolff@crowell.com
12  CROWELL & MORING LLP
    1001 Pennsylvania Avenue, N.W.
13  Washington, D.C. 20004-2595
    Telephone: 202.624.2500
14
    *Attorneys for Plaintiff*
15  THE REGENTS OF THE UNIVERSITY OF
    CALIFORNIA
16

Charles F. Robinson (SBN 113197)
charles.robinson@ucop.edu
Margaret L. Wu (SBN 184167)
margaret.wu@ucop.edu
Allison M. Woodall (SBN 178533)
allison.woodall@ucop.edu
Sonya U. Sanchez (SBN 247541)
sonya.sanchez@ucop.edu
UNIVERSITY OF CALIFORNIA
OFFICE OF THE GENERAL COUNSEL
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: 510.987.9800

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO/OAKLAND DIVISION

|  |  |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California Corporation, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> Defendants. | Case No. 3:20-cv-04621-JSW <br><br> **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> [*Filed Concurrently with Supporting Declarations, Request for Judicial Notice, Proposed Order, Motion to Shorten Time*] <br><br> Date:   July 22, 2020 <br> Time:   2:00 p.m. <br> Ctrm:   TBD <br> Judge:  TBD <br><br> Complaint filed:  July 10, 2020 |

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

1

## TABLE OF CONTENTS

2

I.      INTRODUCTION ................................................................................................. 2

3

II.     FACTUAL BACKGROUND ............................................................................... 3

        A.     COVID-19 ................................................................................................ 3

4

        B.     ICE's Initial COVID-19 Response .......................................................... 5

5

        C.     The University of California's COVID-19 Response .............................. 6

        D.     The Loss of International Students and Harm to the University. ........... 10

6

        E.     Students' Reliance on ICE's March 13 Guidance ................................. 11

7

        F.     ICE's Sudden and Arbitrary Re-imposition of In-Person Education Requirements
               During the COVID-19 Emergency ........................................................ 12

8

III.    LEGAL STANDARD ........................................................................................ 13

9

IV.     ARGUMENT ..................................................................................................... 14

10

        A.     THE REGENTS ARE LIKELY TO SUCCEED ON THE MERITS ................... 16

11

               1.     The Regents Are Likely to Prevail on the First Cause of Action Under
                      the APA Because the July 6 Directive is Arbitrary and Capricious ........... 16

12

                      a.    The Directive Failed to Offer a Reasonable Explanation for
                            ICE's Policy Reversal. ................................................... 17

13

                      b.    The Directive Failed to Consider Important Aspects of the
                            Problem, Including the Reliance of Plaintiff and Its Students on
14
                            the March 13 Guidance. ................................................. 18

15
                      c.    Defendants Failed to Explain Any Basis for the Directive. ........... 20

               2.     The Regents Will Likely Prevail on Its Second APA Cause of Action,
16                    Because the Directive is a Substantive Rule that Did Not Comply with
                      the APA's Notice and Comment Requirements ........................................ 22

17      B.     THE REGENTS AND ITS STUDENTS ARE LIKELY TO SUFFER
               IRREPARABLE HARM ...................................................................... 23

18      C.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH
               HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION ORDER ............. 24

19

V.      CONCLUSION .................................................................................................. 25

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-i-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ...................................................................................13, 25

*Amerijet Int'l, Inc. v. Pistole,*
   753 F.3d 1343 (D.C. Cir. 2014)................................................................................20, 21

*Butte Envt'l. Council v. U.S. Army Corps of Eng'rs,*
   620 F.3d 936 (9th Cir. 2010) ........................................................................................ 16

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ...................................................................................................... 23

*Ciox Health, LLC v. Azar,*
   435 F. Supp. 3d 30, 66 (D.D.C. 2020) ......................................................................... 23

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ...................................................................................................... 16

*Colwell v. Dep't of Health & Human Servs.,*
   558 F.3d 1112 (9th Cir. 2009) ...................................................................................... 23

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) .................................................................................................. 21

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
   No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) ............................................. *passim*

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ................................................................................14, 15, 16, 17

*Enyart v. Nat'l Conference of Bar Examiners, Inc.,*
   630 F.3d 1153 (9th Cir. 2011) ...................................................................................... 24

*FCC v. Fox Telev'n Stns., Inc.,*
   556 U.S. 502 (2009) ...................................................................................................... 17

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ...................................................................................................... 16

*Humane Soc'y of U.S. v. Locke,*
   626 F.3d 1040 (9th Cir. 2010) ...................................................................................... 15

*Jicarilla Apache Nation v. U.S. Dep't of the Interior,*
   613 F.3d 1112 (D.C. Cir. 2010)................................................................................14, 17

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-ii-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) .................................................. 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................... 16

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) .............................................. 23

*Nat'l Res. Def. Council v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011) ............................................. 23

*Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) .............................................. 15

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ......................................................... 18

*Pimentel v. Dreyfus*,
    670 F.3d 1096 (9th Cir. 2012) ............................................. 13

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ............................................. 13

*San Diego Air Sports Ctr., Inc. v. F.A.A.*,
    887 F.2d 966 (9th Cir. 1989) .............................................. 23

*SEC v. Chenery Corp. ("Chenery II")*,
    *332 U.S. 194* ............................................................. 23

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .............................................. 13

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) .......................................................... 13

**Statutes**

5 U.S.C. § 553 ............................................................. 3, 15, 23

5 U.S.C. § 706(2)(A) ...................................................... 3, 14, 16

5 U.S.C. § 706(2)(D) ...................................................... 3, 14, 23

Administrative Procedure Act ............................................. *passim*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

**Other Authorities**

Federal Rule of Civil Procedure 65(b) ............................................................................. 1

*U.S.: Latest Map and Case Count, N.Y. Times,*
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last
visited July 10, 2020) .......................................................................................... 4

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iv-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

## **NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on July 22, 2020, at 2 p.m. or as soon thereafter as counsel may be heard, at the United States District Court for the Northern District of California, Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, California, Plaintiff The Regents of the University of California ("The Regents") will, and hereby does, move for a preliminary injunction against Defendants United States Department of Homeland Security, Acting Secretary of Department of Homeland Security Chad F. Wolf, United States Immigration and Customs Enforcement, and Acting Director of U.S. Immigration and Customs Enforcement Matthew Albence ("Defendants"), pursuant to Federal Rule of Civil Procedure 65(b).

The Regents seeks a preliminary injunction prohibiting Defendants from implementing the July 6, 2020 memorandum issued by defendant U.S. Immigration and Customs Enforcement ("ICE") ("the Directive"), ECF No. 1 at 30,[1] and from promulgating the announced policy as a Final Rule. The Directive announced a reversal of prior ICE policy regarding COVID-19-related exemptions to 8 C.F.R. § 214.2(f)(6)(i)(G) with respect to in-person learning requirements for nonimmigrant students who are studying in this country pursuant to F-1 visas.

Plaintiff seeks an order enjoining Defendants, their officers, employees, and agents, from implementing or enforcing the July 6, 2020 Directive.  Plaintiff so moves on the basis that it will demonstrate that: (1) it is likely to succeed on the merits of its claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706, 553; (2) Plaintiff and its F-1 visa students are likely to suffer irreparable harm absent provisional relief; and (3) the balance of equities and the public interest weigh heavily in favor of maintaining the status quo existing prior to the issuance of the Directive. Plaintiff's Motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities; the currently available administrative record; the supporting Alcocer, Beck, Byington, Christ, Deas, Schooley, and Wakimoto Declarations and exhibits thereto filed in support of Plaintiff's Motion for a Temporary Restraining Order (ECF Nos. 4-1 to 4-9);[2] the

---

[1] The Directive is attached to the Request for Judicial Notice ("RJN") as Exhibit A.
[2] The Regents has agreed to proceed with this Motion for a Preliminary Injunction, in lieu of its Motion for a Temporary Restraining Order, which was filed on July 10, 2020.  ECF No. 4.

1  supporting Does 1 to 4 and Iyengar Declarations and exhibits thereto filed concurrently herewith;

2  the Request for Judicial Notice; the proposed Preliminary Injunction, and such further evidence

3  and argument as the Court may consider.

4  **MEMORANDUM OF POINTS AND AUTHORITIES**

5  **I.    INTRODUCTION**

6         The University of California—renowned as the nation's premier public university system

7  and as a world-class academic and research powerhouse and a key contributor to the California

8  economy and social fabric—has long welcomed international students seeking to pursue unrivaled

9  educational opportunities and, ultimately, their most cherished dreams. These students contribute

10 to rich intellectual discourse across all disciplines, including in the University system's prized

11 science, technology, engineering, and mathematics (STEM) departments, thereby also

12 contributing to the University's mission of delivering and supporting world-class teaching and

13 research, as well as to California's vibrant economy. For decades, the United States' "F-1" visa

14 program for international, non-immigrant students has made all this possible.

15        In March 2020, faced with the unprecedented COVID-19 pandemic, The Regents moved

16 swiftly to transition the University's ten campuses to remote teaching to protect the health and

17 safety of their students and faculty, while continuing to meet its core mission of providing a

18 world-class education. Also recognizing the unprecedented nature of the pandemic, defendant

19 United States Immigration and Customs Enforcement ("ICE"), an agency within defendant the

20 Department of Homeland Security ("DHS"), issued an exemption to a preexisting regulation that

21 required international students on F-1 visas to attend classes in person if they wished to remain in

22 this country. ICE's March 13, 2020 Guidance (the "March 13 Guidance") provided critical

23 assurances that international students could maintain their F-1 visa status while attending classes

24 on-line "for the duration of the [COVID-19] emergency." *See* Request for Judicial Notice

25 ("RJN"), Ex. B at 1.

26        Without warning, on July 6, 2020, Defendants announced that they would largely rescind

27 the COVID-19 exemption for students on F-1 visas and require such students whose universities

28 had transitioned to an online-only curriculum to transfer to an institution offering in-person

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-2-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

classes, or leave the United States. This Directive also effectively bars continuing students on F-1 visas who have already left this country from re-entering the United States, if they intend to take a full online course load in Fall 2020. This arbitrary, capricious, and procedurally defective agency action now forces The Regents to confront an untenable choice: to put its international students in immediate jeopardy of having to abandon their studies and leave the country or take steps to retain them by increasing the number of in-person courses offered for Fall 2020, thereby increasing the risk that its students, faculty, and staff will be exposed to the virus.

The Regents therefore seeks a preliminary injunction order to enjoin Defendants from implementing the Directive. That Directive is not only unjust and unwise, but it violates the Administrative Procedure Act's ("APA") prohibition against agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action, like the Directive, purporting to have the force of law must be both reasonable and reasonably explained. Defendants also failed to satisfy the APA's notice-and-comment requirements for agency action that substantively affects rights or obligations, in violation of 5 U.S.C. § 553. *See* 5 U.S.C. § 706(2)(D) (authorizing the court to set aside agency action taken "without observance of procedure required by law"). The Regents, therefore, is likely to succeed on the merits. Further, it and its students will suffer irreparable harm absent relief. Finally, the balance of equities and the public interest strongly weigh in its favor. Accordingly, this Court should grant provisional relief enjoining Defendants from enforcing the Directive, thereby preserving the status quo pending adjudication of the University's claims.

## II.     FACTUAL BACKGROUND

### A.     COVID-19

As the year began, the terms "novel coronavirus" and "COVID-19" meant nothing to most Americans. That soon changed. Since late 2019, when scientists first identified the novel coronavirus, or SARS-CoV-2, the virus that causes COVID-19 has spread to nearly every corner of the world: There are more than 12 million confirmed cases of the disease, and more than half a

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-3-

SFACTIVE-905707528.3

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

million people have died from it. Leading the pack is the United States, where there have now been more than 3.1 million confirmed cases and over 133,000 COVID-19-related deaths.[3] Moreover, because there is no vaccine for COVID-19, the forecast is grim. *See* ECF No. 4-3 [Decl. of Carrie L. Byington] ("Byington Decl.") ¶ 9. Epidemiologists predict that the domestic death toll from COVID-19 will exceed 200,000 by November. In California alone, there have been more than 320,000 confirmed cases and over 7,000 deaths.[4] Across the United States, more than 3.3 million people have been infected to date, and at least 135,000 have died from the virus.[5]

Certain basic facts about COVID-19 are not genuinely in dispute. For some, it causes symptoms requiring hospitalization or that are life-threatening. ECF No. 4-2 [Decl. of Michael Beck] ("Beck Decl.") ¶ 7. In the most severe cases, the virus is fatal. *Id.* Overwhelming evidence indicates that the most likely means of transmission is through close contact, especially indoors. *Id.* ¶¶ 10-13. In light of these facts, state and local governments have implemented the only measures that reasonably can limit community spread of the virus—issuance of shelter-in-place orders, physical (social) distancing, closure of businesses and other venues where people may gather, diligent and regular sanitization and hygiene, and, where possible, contact tracing. *See id.* ¶¶ 7-11. Governor Newsom announced a state of emergency in California on March 4, and the President of the United States declared a national emergency on March 13. RJN, Exs. C, D.[6] [7] Yet the rate of infection today is considerably higher than it was in March. *See* Beck Decl. ¶ 15.

---

[3] *See Coronavirus in the U.S.: Latest Map and Case Count*, *N.Y. Times*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 10, 2020).

[4] Department of Public Health, State of California, *Covid-19 by the Numbers* (July 13, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx#COVID-19%20by%20the%20Numbers.

[5] The New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, (July 13, 2020, 2:19 P.M. E.T.), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[6] Executive Department, State of California, *Proclamation of a State of Emergency* (March 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.

[7] The White House, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-4-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

**B.    ICE's Initial COVID-19 Response**

The federal government issues F-1 visas to international students who attend accredited American universities or other academic institutions on a full-time basis. 8 C.F.R. § 214.2(f). The requirements for F-1 visa holders are set forth in 8 C.F.R. § 214.2. That regulation states, in relevant part, that the student must take a full course of study and that no more than "one class or three credits" per semester or quarter may be counted toward the full course of study if the class is taken "on-line or through distance education." 8 C.F.R. §§ 214.2(f)(5)(i), 214(f)(6)(i)(G). However, in its initial response to the pandemic, ICE recognized the need for flexibility with respect to these requirements. In particular, on March 9, 2020, ICE's Student and Exchange Visitor Program ("SEVP") issued guidance ("March 9 Guidance") advising that "SEVP-certified schools may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis." RJN, Ex. E at 1.[8] In issuing the guidance, ICE stated that it was "focused on ensuring that nonimmigrant students are able to continue to make normal progress in a full course of study" and that it would be "flexible with temporary adaptations," while further recognizing that "the COVID-19 crisis is fluid and rapidly changing." *Id.*  Further, ICE's March 9 Guidance contemplated the necessity of "leaving room for schools to comply with state or local health emergency declarations." *Id*.

Just days later, on March 13, 2020, ICE issued further "Guidance for SEVP Stakeholders" ("March 13 Guidance") which provided, in relevant part:

> If a school closes temporarily but offers online instruction or another alternative learning procedure, nonimmigrant students should participate in online or other alternate learning procedures and remain in active status in SEVIS…. Given the extraordinary nature of the COVID-19 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess of the limits stated in 8 CFR 214.2(f)(6)(i)(G)…. This temporary provision is only in effect for the duration of the emergency and in accordance with the procedural change documents filed in a timely manner to SEVP.

---

[8] *Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant students* (March 9, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2003-01.pdf ("March 9 Guidance") at 1.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-5-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

RJN, Ex. B at 1.[9] Further, according to its express terms, this Guidance applied to F-1 visa

holders "even if they have left the United States and are taking the online classes from

elsewhere." *Id*. at 1-2.

**C.     The University of California's COVID-19 Response**

Founded in 1868, the University of California was founded upon a simple but audacious

idea: California should establish a great public university available to all—one that would serve

equally the children of immigrants and settlers, landowners and barons.[10] More than 150 years

later, the University today is one of the world's premier educational systems, comprising ten

campuses and educating more than 285,000 undergraduate and graduate students annually.[11] True

to its founding principle, the University continues to be available to all—including approximately

37,500 F-1 visa students from across the globe. ECF No. 4-4 [Decl. of Carol T. Christ] ("Christ

Decl.") ¶ 2.

Consistent with federal, state, and local guidance on preventing the spread of COVID-19,

and consistent with the March 9 and March 13 Guidances, the University undertook, with

substantial investment of time and resources,[12] to transition its academic curricula to remote

instruction in March 2020. Since then, the University has engaged in careful, deliberate, and

iterative planning processes, prioritizing the health and safety of its entire academic community

and that of the surrounding communities, while also continuing to fulfill its mission of providing

world-class educational opportunities to all its students. Christ Decl. ¶¶ 2-6, ECF Nos. 4-5, 4-6

[Ex. A, B to Christ Decl.]; *see also* ECF No. 4-8 [Decl. of Robert T. Schooley] ("Schooley

Decl.") ¶ 15; Byington Decl. ¶¶ 4-6. The University made substantial investment in online

---

[9] *See COVID-19: Guidance for SEVP Stakeholders*,
https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf at 1 ("March 13 Guidance").
[10] *See* https://www.universityofcalifornia.edu/news/university-california-born (last visited July 9, 2020).
[11] *See Fall Enrollment at a Glance (2019)*, University of California,
https://www.universityofcalifornia.edu/infocenter/fall-enrollment-glance (last visited July 9, 2020).
[12] ECF No. 4-1 [Decl. of David Alcocer] ("Alcocer Decl.") ¶ 10. The University of California estimates that if the July 6 Directive takes effect, the cost in additional expenses to the University is likely to be in the millions of dollars. *Id.* ¶ 10.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-6-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

solutions, *see* Alcocer Decl. ¶ 10, in part based on its reliance on ICE's March 13 Guidance that international students would not thereby be precluded from maintaining their F-1 visa status during the COVID-19 crisis and that the exemption would remain "in effect for the duration of the emergency." RJN, Ex. B at 1. That emergency continues to this day and likely will for the foreseeable future.

The University has devoted considerable thought, effort, and resources to determine how best to advance its educational mission while protecting its students, faculty, and staff amidst the pandemic. The University and each campus have monitored state and local government data, recommendations, and directives regarding COVID-19 response and have abided by applicable reopening requirements and shelter-in-place restrictions. *See, e.g.*, Beck Decl. ¶¶ 6; Christ Decl. ¶¶ 6, 16 & Ex. A; Byington Decl. ¶¶ 4-5; Schooley Decl. ¶¶ 3-4, 7-8; ECF No. 4-7 [Decl. of Deborah Deas] ("Deas Decl.") ¶¶ 4-7.

The University and its campuses have also formed numerous working groups and task forces to assess and proactively plan responses to potential scenarios resulting from the pandemic.[13] *See, e.g.,* Byington Decl. ¶¶ 4-6; Christ Decl. ¶¶ 4-9; Schooley Decl. ¶¶ 4, 15; Deas Decl. ¶¶ 3-5; ECF No. 4-9 [Decl. of Roger Wakimoto] ("Wakimoto Decl.") ¶¶ 4-5; Beck Decl. ¶¶ 4-6. For example, in February, researchers at UC San Diego ("UCSD") developed a dynamic compartmental transmission model of COVID-19 to simulate spread among the campus community to provide a quantitative framework for pandemic response planning; they concluded that the University must limit large-scale gatherings, including in classrooms, and limit the density of on-campus housing. Schooley Decl. ¶¶ 6-7. Between April and June, UC Riverside's

---

[13] To take but one campus, UC Berkeley's response has been coordinated by *nine* committees. Christ Decl. ¶ 4. One such committee, the Public Health and Testing Advisory Committee, is chaired by Dr. Nicholas Jewell, Emeritus Professor of Biostatistics in the UC Berkeley School of Public Health and includes infectious disease experts, public health epidemiologists, physicians, scientists with expertise in diagnostic testing, and data scientists. *Id.* Between May and June 2020, this committee evaluated all options for providing a healthy and effective learning environment for the 2020-21 year, from full remote instruction to return to mostly in-person instruction. *Id.* ¶ 8. On June 17, the committee issued its report recommending that "[t]o the extent that any classes occur in person" in Fall 2020, such classes should be limited to "26 [individuals] or under (including instructors)." The report also explained that "remote access will likely be required for most if not all classes because at-risk participants may not be able to attend in person." *Id.* at ¶ 9.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-7-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

("UCR's") Instructional Continuity Working Group, comprising of faculty, staff, and students, evaluated options for providing a healthy and effective teaching environment for the 2020-21 academic year. Deas Decl. ¶ 4. UCR's response to the pandemic is coordinated among ten faculty-led working groups, including public health, budget and finance, student services continuity, student health assistance, instructional continuity, testing, and instructional technology. *Id.* ¶ 6. UCLA's Emergency Management Planning Group began working on UCLA's COVID-19 response in February 2020. *See* Beck Decl. ¶¶ 2, 7-8. UCLA's efforts include its "Back to School" campus-wide working group, and regular consultation between UCLA Health's infectious control experts, officials from other UC campuses, and officials with the LA County Department of Public Health. *See* Beck Decl. ¶¶ 4-6; Wakimoto Decl. ¶¶ 4-5, 8.

At the system-wide level, the University has created a Testing and Tracing Task Force, which includes subject matter experts, administrators, and faculty, and staff from across the University. Beck Decl. ¶ 9; Christ Decl. ¶ 7. The Task Force has emphasized that, for all UC campuses, "[t]he cornerstone of mitigation will be decreasing normal campus population density, in order to decrease interactions that may result in person-to-person transmission of the virus." Christ Decl. ¶ 9; *see also id.* at Ex. B. Beginning in March 2020, the Council of the Vice Chancellors of Research also began holding weekly meetings to provide guidance regarding the impact of the pandemic on university research. Wakimoto Decl. ¶ 4.  And, on May 22, 2020, recognizing the need to dramatically transform on-site operations, The Regents released the "University of California Consensus Standards for Operation of Campus and ANR Locations in Light of the SARS-CoV-2 Pandemic." Christ Decl. ¶ 6, Ex. A.

Following months of study and consultation with epidemiologists, medical experts, and industry experts, all ten campuses created plans for their Summer and Fall 2020 curricula based on the status of COVID-19 in their specific geographic locations. *See, e.g.*, *id.* ¶ 5 (UC Berkeley); Beck Decl. ¶¶ 4-8 (UC Los Angeles); Deas Decl. ¶¶ 15, 20 (UC Riverside); Schooley Decl. ¶¶ 13-16 (UC San Diego). The campuses have dramatically transformed their approach to instruction for Fall 2020 in particular: In reliance on the March 13 Guidance and informed by the May 22, 2020 Consensus Standards, UC Berkeley announced that the Fall semester would be

online with only limited in-person classes. Christ Decl., ¶ 11. UC Davis plans to offer most courses remotely; UC Irvine courses will be remote with minimal exceptions; UCLA is currently all-remote, but anticipates 15% to 20% of courses will be in-person or in a hybrid format; and UC San Diego hopes for 30% in person classes, with 70% remote or hybrid. *See, e.g.*, Deas Decl. ¶¶ 12-15; Beck Decl. ¶¶ 8, 11; Wakimoto Decl. ¶ 9; Schooley Decl. ¶ 16. Thus, classes will be remote in Fall 2020 for most courses and students. Even those courses with limited in-person instruction will also allow for remote attendance. Christ Decl. ¶ 6; Deas Decl. ¶ 15. To implement these recommendations, the campuses expended further time and resources developing a class schedule that accounted for the number and nature of courses and whether they would be held entirely online or in person. *See, e.g.*, Christ Decl. ¶ 12; Schooley Decl. ¶¶ 13-14; Deas Decl. ¶¶ 15, 20. These plans are subject to change, based on new information that infections are now surging in California and elsewhere. *See, e.g.*, Byington Decl. ¶ 15; Schooley Decl. ¶ 16; Wakimoto Decl. ¶ 9.

These precautions have been put in place with additional specific consideration for the University faculty and others with pre-existing health conditions. Christ Decl. ¶ 17. For example, the average UC Berkeley faculty member is 52 years old, with many faculty members over the age of 65. Christ Decl. ¶ 17(d). While every human is at risk from COVID-19, older adults are at the highest risk for severe illness or death. Byington Decl. ¶ 7.

UC Berkeley, like all other UC campuses, has spent months preparing for the Fall semester. *See, e.g.*, Christ Decl. ¶ 16; Deas Decl. ¶ 20; Schooley Decl. ¶ 15. For example, at UC Berkeley, Fall semester enrollment began on July 8, 2020, and UC Berkeley students report back to campus in a few weeks for classes beginning on August 26, 2020. Christ Decl. ¶ 16. Other UC campuses offer undergraduate classes starting in September, and student enrollment in these classes has already begun. *See* Schooley Decl. ¶ 16. At this point, it would be extremely difficult for the campuses to develop a revised educational plan that would enable all international students to maintain their visas under the Directive. Deas Decl. ¶ 20; Christ Decl. ¶ 16; *see also* Schooley Decl. ¶¶ 15-16. In addition to the University's determinations regarding the risk of reopening or adding more in-person instruction, it is an unfair and unnecessary drain on already strained public

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-9-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

1   resources to require the University to upset months of planning for the Fall semester within a

2   matter of mere weeks.

3       **D.      The Loss of International Students and Harm to the University.**

4          The loss of international students enrolled at the University will have substantial adverse

5   effects. Nearly 30% of UC Berkeley's graduate students and 50% of its engineering graduate

6   students are international students potentially affected by the Directive. Christ Decl. ¶ 17; *see also*

7   Deas Decl. ¶ 21(b). These graduate students perform critical research roles and serve as teaching

8   assistants. Christ Decl. ¶ 17. The loss of these students would have significantly detrimental

9   effects on UC Berkeley's ability to carry out its instruction of undergraduates.[14] *Id*. The

10  University's research mission also depends on numerous international partnerships and

11  collaborations, which in turn depend on the recruitment and enrollment of the best and brightest

12  students from across the world, particularly in the science, technology, engineering, and

13  mathematics ("STEM") disciplines. Christ Decl. ¶ 18; *see also* Schooley Decl. ¶ 20(b). Even a

14  semester-long disruption in the University's ability to conduct significant STEM research would

15  have detrimental effects on it as an international research university.[15] *Id*. Further, the loss of

16  diversity at the University should international students be forced to withdraw will have a

17  negative pedagogical impact on all students, who will be deprived of the diversity of perspectives

18  and experience that enrich the learning environment. Christ Decl. ¶ 17; *see also* Deas Dec. ¶ 21(d);

19  Schooley Decl. ¶¶ 20(d), 21(g).

20  _____

[14] Tuition paid by international students is significant to UC's finances. Christ Decl. ¶ 17.
21  International undergraduates at the University accounted for approximately $1.1 billion in tuition
    and fee receipts in the 2019-20 school year. Alcocer Decl. ¶ 5. Tuition and fees attributable to
22  international graduate students account for an additional $350 million. *Id*. ¶ 6. This financial
    shortfall cannot easily be recouped by enrolling other students, particularly due to the difference
23  in tuition between in-state and out-of-state students. *Id*. ¶ 9. These negative financial impacts also
    affect UC's ability to support financial aid and to undertake infrastructure improvements across
24  campuses. *Id*.

[15] Representative research at UC Berkeley that relies in significant part on the enrollment of
25  international students includes, *inter alia*, a project for the U.S. Army in which UC Berkeley
    students are conducting cutting-edge research related to drone technology and a research program
26  developing projection algorithms to predict COVID-19 cases, hospitalizations, ICU admissions,
    and ventilator needs at the county and hospital level throughout the United States. In each case,
27  the loss of international students with discrete and unique skillsets would create extensive delays
    unacceptable to UC's partners and to society writ large.  Christ Decl. ¶ 18.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW                              -10-                    PLAINTIFF'S MOTION FOR
                                                                     PRELIMINARY INJUNCTION
                                                                     CASE NO. 3:20-CV-04621-JSW
SFACTIVE-905707528.3

As a result, the Directive forces University campuses to choose between losing numerous international students who bring immense benefits to the academic community or taking burdensome steps to provide in-person instruction that increases risks to the health of the University's students, faculty, and staff. Christ Decl. ¶ 21; Deas Decl. ¶ 27; Schooley Decl. ¶ 22. Each University campus would be forced to increase the number of in-person classes available, thereby increasing the risk of exposure to the COVID-19 virus to other community members, including the faculty required to lead those in-person classes as well as the staff needed to support them. *See, e.g.,* Christ Decl. ¶ 21. Further, to comply with the Directive, the University will be required to reissue thousands of Form I-20 documents for the F-1 visa holders across each of its campuses. *Id.* at ¶ 17. At UC Berkeley alone, this will require hundreds of staff hours to complete. *Id.*

### E.    Students' Reliance on ICE's March 13 Guidance

As a result of the University's response to the COVID-19 pandemic, which relied in part on the March 13 Guidance, all University students in effect have relied on the March 13 Guidance in planning to attend the University this Fall. International and U.S.-based students alike have taken out loans and made housing arrangements or moved home for the Fall semester anticipating that their studies would resume through remote instruction. *See* Decl. of Doe No. 2 ("Doe No. 2 Decl.") ¶ 8; Decl. of Doe No. 3 ("Doe No. 3 Decl.") ¶ 7;[16] *see also* Decl. of Kavitha Iyengar ("Iyengar Decl.") ¶ 8. Many international students have returned to their home countries in reliance on the government's instruction that their studies could resume online. Many of those students are now unable to return to the United States because of travel restrictions, the government's refusal to re-issue visas and, now, the government's insistence that universities certify that their instruction will proceed in person. *See, e.g.*, Christ Decl. ¶ 19. Other students who have remained in the United States will be forced to leave under the Directive and will be forced to break leases and pay resulting penalties. *Id.*; *see also* Doe No. 1 Decl. ¶ 10; Doe No. 2

---

[16] This Motion for Preliminary Injunction is accompanied by a Motion for Does 1 to 4 to Proceed Under Pseudonyms, filed concurrently herewith.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-11-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

Decl. ¶ 8; Doe No. 3 Decl. ¶ 7.

Practically, it is too late for any student to transfer to another university, mere weeks before the start of the semester, especially international students who must find a university in this country that can certify its intent to offer a mostly in-person curriculum despite the significant health risks involved in doing so.  Even if students wanted to transfer, it is also unlikely that there would be sufficient alternative in-person programs in the country for all international students given the specialized nature of many students' studies and the ongoing pandemic. *See* Doe No. 1 Decl.; Doe No. 2 Decl. ¶¶ 6-8; *see also* Deas Decl. ¶ 23; Iyengar Decl. ¶ 6.

Moreover, international students face emotional and psychological trauma from the sudden and unanticipated disruption to their ability to pursue their education in the United States, the inability to participate in U.S.-based practical training opportunities (e.g. internships) which will further negatively impact their professional prospects, violence and poverty afflicting their home countries, and being forced to return to home country living situations without reliable, high-speed internet access necessary for remote instruction.  *See, e.g.*, Doe No. 1 Decl. ¶¶ 8-10; Doe No. 2 Decl. ¶¶ 6-8; Doe No. 4 Decl. ¶¶ 6; *see also* Christ Decl. ¶ 19; Schooley Decl. ¶ 21.

**F.     ICE's Sudden and Arbitrary Re-imposition of In-Person Education Requirements During the COVID-19 Emergency**

Despite the President's continuing national emergency declaration and the March 13 Guidance's express statement that its exemption from the in-person class requirement would remain "in effect for the duration of the [COVID-19] emergency," on July 6, 2020, ICE suddenly and arbitrarily reversed its course, stating:

1) recipients of F-1 visas are no longer permitted to "take a full online course load and remain in the United States";

2) "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences" such as the initiation of removal proceedings;

3) no new F-1 visas would issue to students planning to enroll in programs that will be fully online for the fall semester;

4) "students attending schools offering a hybrid model – that is, a mixture of online and

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-12-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

in person classes – will be allowed to take more than one class or three credit hours online," provided that for each such student, the school certifies by August 4, 2020, "within 21 business days of publication" of the Directive, "that the school is not operating entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."

RJN, Ex. A.

The Directive also re-characterizes ICE's March 13 Guidance, stating that the earlier guidance "instituted a temporary exemption regarding the online study policy for the *spring and summer* semesters." *Id.* at 1 (emphasis added). Nothing in the March 13 Guidance, however, suggests any such temporal limit. To the contrary, it explicitly stated it would remain "in effect for the duration of the emergency." RJN, Ex. B at 1. Nowhere in the Directive or accompanying News Release, *id.*, Ex. F, does ICE provide any justification for the reversal of policy, nor is there any indication that the government undertook any consideration or analysis of relevant factors such as the impact of the reversal on the health and safety of university students, faculty, and staff, the effect on public health for the communities surrounding every academic institution affected by the policy change, or the justifiable reliance on the March 13 Guidance by universities and students in planning for the Fall 2020 term. The Directive also contains no acknowledgement of the ongoing—indeed, rapidly-worsening—COVID-19 pandemic.

## III.   LEGAL STANDARD

A preliminary injunction may properly issue where the plaintiff establishes that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities" tips in its favor, and (4) an "injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). In certain cases, "serious questions going to the merits" and a hardship balance that tips sharply toward the plaintiff can support the issuance of a preliminary injunction, assuming the other two *Winter* elements are met. *Alliance for the Wild Rockies*, 632 F.3d at 1132. Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (internal citations omitted). Under the Ninth Circuit's "sliding scale" approach, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (internal citations omitted).

## IV.   ARGUMENT

This case arises under the Administrative Procedure Act, which requires that the Court set aside agency action that is, *inter alia*, arbitrary and capricious, otherwise unlawful, or taken without observing procedure required by law. *See* 5 U.S.C. § 706(2)(A), (D). ICE's July 6 Directive fails under the APA standard in at least two general respects: it is both (i) arbitrary and capricious for lack of any reasoned explanation and for failure to consider factors plainly relevant to such a significant reversal of policy, and (ii) defective because ICE failed to provide the public advance notice of its proposed action or any opportunity to comment on it before finalization.

The July 6 Directive is arbitrary, capricious, or otherwise unlawful on at least three separate grounds. *First*, ICE failed to offer in or with the Directive any reasoned explanation for its sudden reversal of the March 13 Guidance—which ICE had stated expressly would extend "for the duration of the emergency." When the government reverses its own earlier policy, it must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citations omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency departure from prior policy impermissible without "explaining its changed position"); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,* No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) ("*Regents*"), at *14-15.

*Second*, ICE failed to consider important aspects of the problem, including: (1) the health risks associated with its new policy; the burden on universities of having to certify thousands of F-1 students as complying with the Directive's strictures regarding in-person instruction, all by August 4, when most students will not yet have committed to their classes; (2) the impact of the

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    reversal on the finances of, and other costs that must be borne by, universities, due to the loss of

2    tuition from F-1 students who disenroll or from having now to provide safe in-person instruction

3    and certify that each student engaged in a hybrid program that meets the Directive's requirements;

4    and (3) the many reliance interests, both of the University and its F-1 students, that ICE's now

5    abandoned March 13 Guidance engendered. An agency must grapple with such issues when it

6    issues a substantive rule affecting the rights or obligations of individuals or entities.[17] *See Encino*

7    *Motorcars,* 136 S. Ct. at 2124-2126.

8            *Third*, ICE failed to articulate any rational connection between the facts it found and the

9    choice it made. *See Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687

10   n.15 (9th Cir. 2007); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010).

11           Further, the July 6 Directive is fatally flawed, because it is a substantive rule affecting the

12   rights and obligations of the University and its students, and the promulgation of which required

13   ICE to first give notice to the public of its intent to adopt the rule, and provide any interested

14   person with an opportunity to comment before the Directive was finalized. 5 U.S.C. § 553(b). It

15   did not do that and, therefore, the July 6 Directive is unlawful for failure to follow the rulemaking

16   procedure required by the APA.

17           On both claims, Plaintiff is likely to succeed on the merits. The other preliminary

18   injunction requirements are likewise readily satisfied. As the supporting declarations make

19   abundantly clear, the University of California system stands to suffer substantial and irreparable

20   harm absent a preliminary injunction preserving the status quo. The balance of equities also

21   weighs heavily in favor of injunctive relief: Plaintiff and its students will be injured immediately

22   and irreparably under the Directive, while the United States stands to lose nothing if the Directive

23   is enjoined. After all, a preliminary injunction would merely maintain the status quo the

24   government itself instituted, responsibly, in its March 13 Guidance, which it stated at the time

25

26   _____

     [17] ICE concedes its July 6 Directive is intended to operate as a final rule. The Directive itself
27   states that the "U.S. Department of Homeland Security plans to publish the procedures and
     responsibilities in the below Broadcast Message [the July 6 Directive] in the near future *as a*
28   *Temporary Final Rule in the Federal Register.*" RJN, Ex. A at 1 (emphasis added).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-15-

SFACTIVE-905707528.3

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

1    would remain in place for the duration of the emergency. The emergency is not over. Finally, a

2    preliminary injunction is in the public interest. The value to the public of colleges and universities

3    having vibrant and diverse student bodies, including international students, is obvious—that value

4    manifests not merely in the form of the cultural experiences of individual students or the student

5    body and campus life generally, but in the economies of the host communities. If the international

6    students leave, that value to the public is lost.  Alternatively, coercing a mass re-opening (which

7    appears to be Defendants' conceded purpose, as discussed below) while the pandemic is still

8    raging would risk increased transmission and community spread, harming the public in all the

9    ways public health officials have been warning about.

10        **A.     THE REGENTS ARE LIKELY TO SUCCEED ON THE MERITS.**

11            **1.     The Regents Are Likely to Prevail on the First Cause of Action Under
                    the APA Because the July 6 Directive is Arbitrary and Capricious.**

12           The Administrative Procedure Act "sets forth the procedures by which federal agencies

13    are accountable to the public and their actions subject to review by the courts." *Franklin v.*

14    *Massachusetts*, 505 U.S. 788, 796 (1992). In evaluating whether agency actions are reasonable

15    and lawful, courts must conduct a "thorough, probing, in-depth review" of the agency's reasoning

16    and a "searching and careful" inquiry into the factual underpinnings of the agency's decision.

17    *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). A court "shall"

18    set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in

19    accordance with law." 5 U.S.C. § 706(2)(A); *see also Butte Envt'l. Council v. U.S. Army Corps*

20    *of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010). Agency action should be set aside as arbitrary and

21    capricious if the agency fails to explain the basis of its decision, fails to consider all relevant

22    factors and articulate a "rational connection between the facts found and the choice made," or

23    fails to offer a "reasoned explanation" for departures from preexisting policies. *Motor Vehicle*

24    *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted); *Encino*

25    *Motorcars*, 136 S. Ct. at 2126 (in explaining its changed position, agency must also be cognizant

26    that prior policies may have "engendered serious reliance interests that must be taken into

27    account"); *see also Regents*, 2020 WL 3271746, at *14. The Directive fails each of these

28    requirements.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-16-

1
2

        **a.**    **The Directive Failed to Offer a Reasonable Explanation for ICE's Policy Reversal.**

3
4
5
6
7
8
9
10
11
12

      Having stated in that earlier Guidance that the policy would remain in effect "for the duration of the emergency," it was nothing short of shocking that ICE would announce in the Directive that F-1 students would not be allowed into the country or, if already here, would be required to leave, if their schools are not intending to provide traditional classroom instruction, and that universities would have to certify by August 4 that the courses selected by thousands of international students in hybrid programs meet the Directive's in-person classroom strictures. The July 6 Directive never acknowledges what the March 13 Guidance actually said – that it would remain in place for the duration of the emergency – or explains why ICE changed course. The Directive instead states that ICE had only provided guidance for the "spring and summer semesters." That is not correct. *See* RJN, Ex. B at 1.

13
14
15
16
17
18
19
20
21
22

      Even where authorized to do so, when a federal agency reverses its own prior policy, it must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla*, 613 F.3d at 1119 (D.C. Cir. 2010) (internal citation omitted); *see also Encino Motorcars*, 136 S. Ct. at 2126 (agency cannot depart from prior policy without "explaining its changed position"); *Regents*, 2020 WL 3271746, at *14-15 (finding that DHS's decision to rescind the Deferred Action for Childhood Arrivals (DACA) program was arbitrary and capricious, in part because DHS's memorandum rescinding the program failed to consider certain aspects of policy). Thus, reversing a pre-existing policy requires a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Telev'n Stns., Inc.*, 556 U.S. 502, 515 (2009).

23
24
25
26
27

      Here, as discussed, the Directive represents a complete reversal of Defendants' earlier Guidance on not only the existence and severity of the COVID-19 pandemic but, more importantly, the ability of students studying on F-1 visas "to continue to make progress in a normal course of study." *See* RJN, Ex. E at 1. The failure to provide any justification for the reversal is contrary to law and requires that the Directive be set aside.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-17-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

1

2

      **b.**      **The Directive Failed to Consider Important Aspects of the Problem, Including the Reliance of Plaintiff and Its Students on the March 13 Guidance.**

3          Further, the Directive fails to consider, much less evaluate, the significant reliance

4  interests of both the University and its affected students engendered by the current DHS/ICE

5  policy. *Regents*, 2020 WL 3271746 at \*4; *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106

6  (2015) (government must provide special justification "when its prior policy has engendered

7  serious reliance interests that must be taken into account"). The Directive also fails to consider the

8  health risks that a broader re-opening of in-person classes would entail; the burdens on the

9  universities (and the likely impossibility) of having to certify, by August 4, that the courses

10  chosen by each F-1 visa holder in a hybrid program comply with the in-person classroom

11  strictures of the Directive; and the financial and other impacts the Directive would have on

12  universities and their educational programs, as well as on students, faculty and staff.

13          The March 13 Guidance expressly permitted F-1 students to "participate in online or other

14  alternate learning procedures" and assured universities and students that the policy would be "in

15  effect for the duration of the emergency." *See* RJN, Ex. B at 1; *see also id*. at 1-2 (applying same

16  policy to international students who return to their home countries and continue to take classes

17  on-line). To change this policy with no notice and without considering any of these effects is an

18  arbitrary, capricious, and unreasoned agency action. It must be set aside.

19          Based in part on the March 13 Guidance, the University started preparing and planning for

20  the Fall 2020 semester four months ago. *See* Christ Decl. ¶ 3. Specifically, at each campus, the

21  University engaged its faculty in the assessment and development of COVID-19 recovery and

22  resiliency planning to ensure the safety of its university community while continuing to carry out

23  its education and research mission. *See generally id.*, ¶¶ 4-17. The University invested millions of

24  dollars and thousands of faculty hours tackling important considerations impacting health and

25  safety. Alcocer Decl., ¶ 10. At UC Berkeley alone, nine committees of experts across numerous

26  disciplines have worked for months to determine the University's best course forward in the Fall.

27  Christ Decl., ¶ 4. Relying on the fact that international students could continue their studies

28  online, the University administration and various working groups devised a complex course

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-18-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

schedule that accounted for the large number of courses, the nature of individual courses and the feasibility of transitioning those courses to online instruction. *Id.* ¶ 12. The University's Fall semester curriculum assumed that international students would continue to be enrolled even if their classes would be held primarily online. *Id.* at ¶¶ 11-16. Also relying on the March 13 Guidance, the University's Fall curriculum assumed that international graduate students would continue as teaching assistants. Similarly, the University's budget for the Fall semester assumed the continued enrollment of international students. Alcocer Decl., ¶¶ 5-6. The disenrollment of international students from the University in the Fall semester alone caused by the enforcement of the Directive could be substantial, and likely cannot be made up by extending offers at this late date to U.S.-based students. *Id.*

UC's students who hold F-1 visas relied on the March 13 Guidance as well. *See* Christ Decl. ¶19. Many international students continued to live near their campuses in reliance on the fact that they could continue their instruction, albeit remotely, through the Fall 2020 semester. *Id.* If the Directive is enforced, those students who remained in the U.S. during the Summer would be forced to break their leases at great expense. *Id.* Those students who have already left the country planning to return for the Fall semester, have not made plans to transfer to other universities – and are to suffer significant interruption in their education with negative impacts to their career prospects. Other international students will be unable to participate in U.S.-based practical training opportunities like internships that will further impact their development of practical skills and professional networks.

Had these international students known that Defendants would abruptly issue its Directive, thereby reversing the March 13 Guidance, these students could have made other arrangements for Fall 2020. Now, it is too late to expect students to transfer to other universities, especially for those students in specialized courses of study, as the Directive suggests that students may do. Moreover, similarly-situated universities dealing with the devastating effects of COVID-19—indeed, all of them—would also be forced to primarily offer online instruction. The government's facile instruction that international students simply enroll in a different university offering in-person instruction is particularly cruel under the circumstances.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

-19-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

Beyond reliance interests, the Directive is oblivious to other important aspects of the problem. Among other things, Defendants failed to consider the social, academic, and research impacts of their decision. Many students have already reported the emotional and psychological harm from the sudden, unanticipated about-face in the government's immigration policy. Others have expressed concern about being forced to return to the violence and poverty afflicting their home countries or being forced to return to their home countries where there may not be adequate access to reliable high-speed internet required for remote learning technologies.

The Directive also fails to account for the various benefits and contributions made by international students to institutions of higher learning. *All* students benefit from a diversity of perspectives and experiences. Depriving universities of a key element of their diverse student bodies does real damage to the institution of learning and to all students' educational experience. Moreover, international students play critical roles in the University's research partnerships as discussed above. The threat to the University's research objectives caused by the removal of international students merely because their coursework will take place online in the midst of a global pandemic is substantial. In some cases, the setback in research due to the loss of the unique skillsets of many such students is months, if not years. *See* Christ Decl. ¶ 18; Deas Decl. ¶¶ 21(a), 23; Schooley Decl. ¶ 20(a). Further, Defendants have not acknowledged, much less analyzed or considered, the extreme setback to public health that their Directive represents. As a result of the significant losses threatened by the disenrollment of thousands of international students, the Directive will likely force universities to prematurely revert to in-person instruction, upending any gains made by communities in quelling the rapid spread of COVID-19 and squandering the past sacrifice of millions across this country. Many of these harms are explained further below, in the discussion of irreparable harm, and detailed more completely in the attached declarations. But in addition to the Court's evaluation of the gravity of the harms for purposes of that separate prong of the preliminary injunction test, it must consider ICE's lack of attention to these harms in evaluating the reasonableness of the agency's action. Here, the July 6 Directive lacks the *sine qua non* of lawful agency action: reasoned decision-making. *See Regents,* 2020 WL 3271746, at *15.

c.      **Defendants Failed to Explain Any Basis for the Directive.**

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-20-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

The Directive is arbitrary and capricious also because it does not articulate *any* rationale that would justify ICE's decision. It is "a fundamental requirement of administrative law ... that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (internal citation omitted). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id.* (internal marks omitted); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (an agency must "articulate[] a satisfactory explanation for [its] decision").

The two and one-half page Directive fails this threshold test. It threatens to inflict grievous harm on hundreds of thousands of F-1 visa-holding university students who were invited to study at American universities, including the potential for removal proceedings to make them leave, without providing *any* explanation—much less a clear and adequate explanation—as to why.

The sole statement that might be considered a "justification" is the statement that while "accommodations to provide flexibility to schools and nonimmigrant students" may be made, such accommodation must be weighed against "a concordant need to resume the carefully balanced protections implemented by federal regulations."  RJN, Ex. A at 1. Such threadbare and cryptic justification is woefully deficient, if for no other reason than the fact that it cannot possibly be based on "the relevant data," such as the well-documented fact that the COVID-19 health crisis is currently intensifying, not abating. *See Dep't of Commerce*, 139 S. Ct. at 2569. This is demonstrable from the simple fact that the rate of infections and hospitalizations is greater today than it was when the March 13 Guidance issued. Moreover, the government itself is predicting that as many as 1.5 million people may ultimately die from COVID-19 illness, with over 200,000 of those deaths occurring by November 1. Thus, to the extent that this statement can be read as the federal government's justification for its abrupt about-face from its March 13 Guidance, it is inadequate as insufficiently based on fact and reason.

Moreover, DHS has admitted publicly that the *actual* basis for the reversal of the policy rests on political considerations rather than rational decision-making after reasoned deliberation and consultation with experts. Acting Deputy Secretary of Homeland Security Kenneth Cuccinelli set pretext aside when he plainly announced, on July 7, 2020, that the F-1 visa policy change is

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-21-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

1    designed to "encourage schools to reopen."[18]

2           In light of Defendants' failure to provide any comprehensible rationale for its about-face,

3    the Directive rescinding the March 13 Guidance should be set aside. *SEC v. Chenery Corp.*

4    *("Chenery II"),* 332 U.S. 194, 196–97 (a court cannot "be compelled to guess at the theory

5    underlying the agency's action; nor can a court be expected to chisel that which must be precise

6    from what the agency has left vague and indecisive."); *Nat'l Ass'n of Home Builders v. Norton*,

7    340 F.3d 835, 849 (9th Cir. 2003) (same).

8                    **2.    The Regents Will Likely Prevail on Its Second APA Cause of Action,
                           Because the Directive is a Substantive Rule that Did Not Comply with
9                          the APA's Notice and Comment Requirements.**

10          The Regents are also likely to succeed on its claim that the Directive purporting to rescind

11   the March 13 Guidance also fails to meet the APA's procedural requirements. The Directive is a

12   legislative rule compelling universities to take certain action, not previously required, under pain

13   of being deemed out of compliance. Indeed, ICE states in the Directive itself that it intends to

14   publish its content at some future time in the Federal Register as a Temporary Final Rule.

15   Because the Directive is a legislative rule, DHS was required to abide by the full panoply of APA

16   procedures, including providing notice and an opportunity for public comment. It failed to do so.

17          Under the APA, courts must set aside agency action that is taken without observance of

18   procedures required by law. 5 U.S.C. § 706(2)(D). An agency's substantive rules must go through

19   the APA's notice-and-comment rulemaking requirements before they become effective. *See* 5

20   U.S.C. § 553(b), (c); *San Diego Air Sports Ctr., Inc. v. F.A.A.*, 887 F.2d 966, 971 (9th Cir. 1989).

21   A rule is substantive if it "narrowly limits administrative discretion" or establishes a "binding

22   norm" that "so fills out the statutory scheme that upon application one need only determine

23   whether a given case is within the rule's criterion." *Colwell v. Dep't of Health & Human Servs.*,

24   558 F.3d 1112, 1124 (9th Cir. 2009). Put another way, an agency's substantive rule that has the

25

26   ───────────────────────
     [18] John Bowden, *Cuccinelli says rule forcing international students to return home will*
27   *'encourage schools to reopen',* The Hill (July 7, 2020, 4:17 PM),
     https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-
28   students-to-return-home

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

"force and effect of law" is subject to the APA's notice and comment procedures. *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-303 (1979); *accord Ciox Health, LLC v. Azar,* 435 F. Supp. 3d 30, 66 (D.D.C. 2020) (explaining that "a rule is legislative, and therefore must undergo notice and comment, when it 'change[s] the law,'" and concluding that HHS's amended rule and guidance regarding fees for delivering health records was a legislative rule subject to notice and comment) (*quoting Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011)).

Here, the Directive is a substantive rule for which the APA's notice-and-comment requirements applied. Among other things, because the University is adopting a hybrid model – that is, a mixture of on-line and in-person classes –for the Fall 2020 semester, the Directive compels the University to certify to SEVP for each of its 37,000-plus F-1 students that, among other things, "the student is not taking an entirely on line course load" by August 4, 2020. Christ Decl. ¶ 17(f). This is a significant burden on the University as it will require thousands of hours of staff time, further exacerbated by the fact that only designated school officials certified by DHS may perform these tasks, thereby significantly limiting the University's ability to adapt to this substantial added burden. *Id.*. The Directive also compels F-1 visa students to take courses in-person to be able to remain in the United States to continue pursuing their studies or face the threat of visa revocation or even removal. ICE/SVEP is also conditioning the UC students' maintenance of their F-1 nonimmigrant status upon compliance with the Directive. The Directive is indisputably a substantive rule, subject to notice and comment requirements.

### B.   THE REGENTS AND ITS STUDENTS ARE LIKELY TO SUFFER IRREPARABLE HARM.

The Directive is already inflicting severe and irreparable harm on the University. The University is being forced right now to grapple with decisions with life-altering consequences for its international students as well as serious impacts to the health and safety of everyone affiliated with the University and the communities that it serves. The Directive presents the University with a difficult choice: reopen more of its lecture halls, dormitories, and dining halls at increased risk to the health of all of its students, faculty, and staff, *or* effectively prevent the University's F-1 visa students the opportunity to carry out their studies and, thus, deprive all other University

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

students of the diversity of opinion and perspective that they expect and is central to the pedagogy of a world-class academic institution. The July 6 Directive threatens irreparable consequences for its academic community, including the immediate loss of valued students and the erosion of any gains made to date in protecting its community from an even higher rate of transmission of the potentially deadly COVID-19 virus. That the Directive theoretically permits UC students with F-1 visas to transfer to another university does not materialize into realistic options for UC students at this time. In this situation, "[a] delay, even if only a few months, pending trial represents precious, productive time irretrievably lost." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011). Moreover, it is no solution to permit international students to take a "hybrid" course load where then any international student with a pre-existing medical condition that makes her susceptible to severe illness resulting from COVID-19 would be unfairly discriminated against for opting not to attend in person classes.

The Directive further creates economic harm to the University. *See* Alcocer Decl. ¶¶ 5-6. Moreover, the budget shortfall will also prevent the University from carrying out planned infrastructure and capital improvements to its campus facilities. *Id*. ¶ 9. Even before the Directive, the University was reeling from the economic fall-out of the COVID-19 pandemic and the resultant transition to on-line learning. Indeed, the University spent millions developing its COVID-19 recovery and resiliency plans, which investment would be rendered meaningless if the University were forced to abandon its well-considered plan to protect the health of its community. *Id*. ¶ 10. Furthermore, the University estimates that it will have to expend significant resources to reissue I-20 forms for the thousands of students affected by the Directive. *See* Christ Decl., ¶ 17.

More importantly, if the Directive is implemented, the University will suffer the loss of many international students who are vital to the pedagogy of its lecturers, the vibrancy of its culture, and the success of its research programs. The University and surrounding community will further lose the substantial economic benefit from international students. Christ Decl. ¶ 19(d).

**C.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF A PRELIMINARY INJUNCTION ORDER.**

The final elements of the preliminary injunction test—the balance of equities and the

CROWELL & MORING LLP
ATTORNEYS AT LAW

-24-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3

public interest—merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *See id.* at 766.

The balance of equities and the public interest weigh strongly in favor of granting injunctive relief to The Regents to maintain the status quo, in advance of the August 4 deadline to submit Form I-20 certifications to ICE.  RJN, Ex. A at 1. While UC and its students holding F-1 visas will be severely impacted should the Directive be implemented, the Defendants face no articulable harm should the Court grant relief. Since Defendants intended for the March 13 Guidance to remain "in effect for the duration of the emergency," they cannot now claim that they will be harmed by the continuation of their sound, prior policy. As discussed above, the public health emergency caused by the COVID-19 pandemic is ongoing, and there is no reasonable basis to contend otherwise. Further, the reversal in policy appears to stem from a desire to reopen schools regardless of whether doing so will harm the health and lives of students, faculty, and staff and place others with whom university community members come into contact at risk. The balance of equities between UC's goal of protecting the health and well-being of its community and maintaining its academic freedom on the one hand, and a federal government seeking to coerce in-person activity at universities on the other, tips sharply in favor of granting the injunction. It is in the public interest that Defendants be enjoined from carrying out their arbitrary and capricious plan to force the premature transition of universities to in-person learning.

Finally, a preliminary injunction is appropriate where, as here, the hardship balance tips sharply toward the plaintiff, and the plaintiff has articulated "serious questions going to the merits." *Alliance for the Wild Rockies*, 632 F.3d at 1132. The Regents have demonstrated "a fair chance of success on the merits" on their claims and irreparable harm if the Directive is permitted to proceed. Further, the balance of equities and the public interest favor the Regents.

## V.   CONCLUSION

For all the above reasons, this Court should issue a preliminary injunction that (i) enjoins Defendants from proceeding with their July 6 Directive and (ii) orders that Defendants preserve the status quo ante pending adjudication of this dispute on the merits.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

SFACTIVE-905707528.3

1    Dated: July 13, 2020                    Respectfully submitted,

2                                            CROWELL & MORING LLP

3
                                            By: */s/ Jennifer S. Romano*
4                                               Jennifer S. Romano
                                                A. Marisa Chun
5                                               Emily T. Kuwahara
                                                Thomas A. Lorenzen
6                                               Daniel W. Wolff
                                                Molly A. Jones
7                                               *Attorneys for Plaintiff*
                                                THE REGENTS OF THE UNIVERSITY OF
8                                               CALIFORNIA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-26-

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 3:20-CV-04621-JSW

SFACTIVE-905707528.3